727 A.2d 1089

COMMONWEALTH of Pennsylvania, Appellee,

v.

**Roderick Andre JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 17, 1998.

Decided March 26, 1999.

Reargument Denied June 28, 1999.

218

John T. Adams, Reading, for R. Johnson.

Mark C. Balwin, Reading, Robert A Graci, Harrisburg, Iva C. Dougherty, Reading, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

Roderick Andre Johnson (Appellant) files this direct appeal of his two convictions for first-degree murder and death sentence following a jury trial. We affirm.

In our direct review of all cases in which the death penalty is imposed, this Court independently reviews the sufficiency of the evidence regardless of whether the defendant challenges the conviction on that ground. *Commonwealth v. Jones*, 546 Pa. 161, 173, 683 A.2d 1181, 1186 (1996) (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982)). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the offenses beyond a reasonable doubt. *Jones, supra.* We review the evidence, discuss the issues, and conclude if there were errors.

## I. FACTS AND PROCEDURAL HISTORY

Appellant, along with co-Defendants Shawn Bridges (Bridges) and Richard "Rambo" Morales (Morales), was charged in connection with the murders of Damon Banks and Gregory Banks. The trial court record shows, based substantially on statements that Appellant gave to police, that on Saturday, December 7, 1996, the girlfriend of co-Defendant Bridges was robbed at gunpoint. The robbers indicated that they were looking for drugs and money. Although no drugs or money were found, the robbers took a camcorder and a Sony Playstation. News of this incident quickly made its way to Bridges. Bridges' girlfriend told him that the robbers had

been wearing green masks and green "hoodies." Bridges recalled seeing Gregory and Damon Banks wearing green hoodies earlier that day. Bridges and the Appellant went to the home of co-Defendant Morales. While there, Bridges grabbed a shotgun and mentioned that he wanted to go to the house of Gregory and Damon Banks and murder them. Bridges showed the Appellant and Morales a 9–mm Glock pistol that he had on him.

On December 8, 1996, the three co-conspirators headed to a local K-mart to purchase shotgun shells. They traveled in a minivan and arrived at Gregory and Damon Banks' house. While Bridges went to talk to them, the Appellant noticed a woman unloading groceries next door. Bridges came out of the house with Gregory and Damon Banks, and stated that he wanted them to take care of his drug-selling operations while he was away. Gregory and Damon Banks entered the minivan with Bridges, the Appellant, and Morales, and the group drove to a dirt road near a car lot and construction site. Bridges and Morales said that they were going to show Gregory and Damon Banks where the drugs were hidden, and asked Gregory and Damon Banks to accompany them. They refused, and Bridges and Morales returned to the van. Bridges then approached Appellant and told him that he would shoot Gregory and Damon Banks on the count of three. Bridges then walked around the front of the van, and shouted "What's on station two and three?" At that point, Bridges started shooting. In statements given to police, Appellant claimed that Bridges also fired a shot at him, hitting him in the side of his torso. Appellant stated that the van then drove away, and Appellant walked two miles to the Queen City Restaurant, where he was subsequently picked up and taken to the hospital for treatment of his gunshot wound.

■ Appellant was tried separately from the other co-defendants for the murders of Gregory and Damon Banks from November 13, 1997 to November 26, 1997, with the jury returning guilty verdicts of first-degree murder for both victims. At trial, the Commonwealth presented a crucial piece of evidence that contradicted Appellant's claims that he was not

involved as a shooter. The Commonwealth presented testimony from a forensic pathologist that one of the bullets recovered from the body of Damon Banks was a .38 caliber bullet. A .38 caliber handgun was recovered close to the murder scene and, according to the testimony of the Commonwealth's ballistics expert, was the weapon used to fire that bullet. George Robles testified at trial that Appellant possessed a .38 caliber handgun like the one found at the murder scene. Robles testified that Appellant told him, while he was visiting Appellant at the hospital, that he had taken the .38 caliber handgun with him, had wiped it off with his shirt and threw it on the side of the road within a quarter mile of the murder scene.

We conclude, based on our independent review of the record, that the Commonwealth presented sufficient evidence to prove Appellant's guilt of the murders of Gregory and Damon Banks beyond a reasonable doubt. We now turn to the specific allegations of trial court error raised by Appellant.

## II. DISCUSSION OF ALLEGED TRIAL COURT ERRORS

### A. Alleged Brady Violations

#### 1. The Robles Letter

Appellant claims that the Berks County District Attorney's office violated the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the production of all material evidence tending to exculpate the defendant. The basis of this claim is the prosecutor's failure to produce a letter written by George Robles, a crucial witness for the Commonwealth, while Robles was in prison on material witness bail [1] in connection with another murder case involving Appellant, referred to as the "Schuylkill Avenue" murder.

---

1. The Commonwealth may seek material witness bail where there is adequate cause to believe that a material witness to a crime will fail to appear when required if not held in custody or released on bail. Pa.R.Crim.P. 4017(a).

Robles wrote this letter to Angel Cabrera, a member of the Reading police department, and stated:

> Angel. Look I can't take this jail. I am doing everything possible to help you. Please, Please help me. I'm not a runner you know that I just want to go home. I can't eat. I can hardly sleep and I feel like I'm in here forever. Angel, I feel like I'm dying here. I am begging you and [Detective] Vega with my word as a man and father to be. I'm not running. Just send me home please. I will do anything. . . .

The letter is not dated, but a police report prepared by Detective Cabrera noting receipt of the letter was dated February 28, 1997. Appellant claims that, had he been in possession of this letter, he could have impeached Robles by showing a strong motive for Robles to fabricate his testimony, and that this letter constituted material impeachment evidence that the prosecutor was required, pursuant to *Brady*, to produce.

The Sixth Amendment concerns implicated in the *Brady* rule focus on whether the prosecutor's failure to disclose material exculpatory evidence deprived the defendant of a fair trial. *U.S. v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard for determining whether the information is "material" varies depending on whether the failure to disclose follows a specific request by the defendant for the information, or a general request for all exculpatory evidence. *See Commonwealth v. Green,* 536 Pa. 599, 604, 640 A.2d 1242, 1244–45 (1994) (citing *Commonwealth v. Moose,* 529 Pa. 218, 233, 602 A.2d 1265, 1272 (1992)). If the defendant made a specific request for the information, then the test for materiality is "whether the evidence might have affected the outcome of the trial." *Green,* 536 Pa. at 604, 640 A.2d at 1245. However, if the defendant made a general request for exculpatory evidence, then the evidence is considered material only if the omitted evidence creates a reasonable doubt that did not otherwise exist. *Id.*

Material impeachment evidence is included within the scope of the *Brady* rule. *See U.S. v. Pelullo,* 105 F.3d 117,

122 (3d. Cir.1997). However, in order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence. *Commonwealth v. Morales*, 549 Pa. 400, 414, 701 A.2d 516, 523 (1997).

██ The record indicates that Appellant's counsel filed formal discovery requests with the District Attorney's office on January 31, 1997, and February 4, 1997, in which he requested "[a]ny evidence favorable to the accused which is material either to guilt or to punishment, and which is in the possession or control of the attorney for the Commonwealth." The record contains no further formal discovery requests from Appellant's counsel. However, during a post-trial evidentiary hearing conducted by the trial court,[2] the parties submitted a June 4, 1997 letter from the District Attorney to Appellant's counsel, which was in response to an informal discovery request.[3] This letter noted that the discovery packet enclosed

**2.** The trial court held this hearing on February 26, 1998, pursuant to Appellant's "Motion for an Evidentiary Hearing Regarding After–Discovered Evidence." The Commonwealth objected to this hearing because the trial court lacked jurisdiction due to Appellant's filing of a Notice of Appeal to this Court on December 22, 1997. Inexplicably, the record had not been transferred to this Court by the time of the trial court's February 26, 1998 evidentiary hearing. The trial court noted the Commonwealth's jurisdictional objection, and later stated in its Pa.R.A.P. 1925(a) Opinion that it did not have jurisdiction to grant Appellant relief respecting the February, 1998 motion. However, the trial court wisely decided that it would be in the interests of "judicial economy" to create an evidentiary record to facilitate this Court's review of Appellant's *Brady* issue.

We applaud the trial court's decision to proceed with an evidentiary hearing to create a record for our review of Appellant's *Brady* claims. In direct review of capital cases, we relax the rules regarding waiver of issues on appeal and examine issues despite counsel's failure to preserve them properly. The trial court's decision to create an evidentiary record notwithstanding the filing of the Notice of Appeal unquestionably aids our review of this issue, and accords with the trial court's limited authority following appeal. *See* Pa.R.A.P. 1701(b)(4) (following appeal, trial court may "[a]uthorize the taking of depositions or the preservation of testimony where required in the interests of justice").

**3.** There is no mention in the record as to how Appellant made this informal discovery request, or what specifically Appellant requested.

with the District Attorney's letter contained "Reading Police Department Crime Investigation Report, Assignment # 96–57168."

Detective Cabrera testified that the Reading Police Department Crime Investigation Report, Assignment Number 96–57168, referred to the department's file on the Schuylkill Avenue murder case. Included in this file was a two-sentence report, dated February 28, 1997, prepared by Cabrera. This report referred to the Robles' letter, and contained a notation "See Letter" at the end of the report. The letter was not, however, appended to the report in the materials produced to Appellant's counsel. On examination, Detective Vega, who was also involved in the investigation of the Schuylkill Avenue murder, testified that the letter was not included in the materials forwarded to the District Attorney, and that only the report had been forwarded. Vega further testified that the letter was not sent to the District Attorney's office until July 15, 1997, when LeRoy Levan, counsel for Shawn Bridges in the Schuylkill Avenue murder case, specifically requested a copy of the letter. Mr. Levan testified that, after reviewing the February 28, 1997 police report included in the discovery packet for the Schuylkill Avenue murder case, he wrote to the District Attorney and requested a copy of the letter referenced in the report. He also testified that the District Attorney gave him this letter on September 29, 1997, and this was provided him without the need for a court order.

Appellant's counsel was provided a copy of the police report that referred to the Robles letter but never requested an actual copy of the letter. The contrast between his actions and those of Mr. Levan illustrate the difference between "general" requests for discovery and "specific" requests for purposes of determining which *Brady* standard applies. Appellant's counsel requested exculpatory material generally, and his other discovery requests swept as broadly as *Brady* would permit. By comparison, Mr. Levan wrote to the District Attorney specifically requesting production of the Robles letter. Had the District Attorney failed to comply with Mr. Levan's request, our standard for evaluating the "materiality"

of the Robles letter would be whether production of the letter might have affected the outcome of Shawn Bridges' trial. *See Green, supra.* However, in this situation, Appellant's counsel relied on his general discovery requests and, after having been made aware of the existence of the letter, never specifically requested it. Therefore, our determination of whether the Robles letter constitutes "material" exculpatory evidence for *Brady* purposes depends on whether its omission creates a reasonable doubt that did not otherwise exist. *See Moose, supra.*

■■■■■■ Preliminarily, we believe that the Commonwealth discharged its *Brady* disclosure responsibilities by providing Appellant's counsel with the police report that referenced the Robles letter. The thrust of the *Brady* rule is to allow for fair trial preparation through the *disclosure* of material exculpatory information. *See Green,* 536 Pa. at 605, 640 A.2d at 1245 ("we must, therefore, consider any adverse effect that the prosecutor's failure to *disclose* might have had on not only the presentation of the defense at trial, but the preparation of the defense as well") (emphasis added). Indeed, in *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992), this Court found a *Brady* violation where the prosecutor failed to provide the identity of Sonny Oglesby, an important jailhouse informant. As we stated in *Moose:*

> [i]n the case before us, Moose never made a request for the criminal records of any government witnesses, nor did he request information about any promises, inducements, rewards or agreements between the witnesses and the Commonwealth. However, Moose's failure to seek such information is directly traceable to the failure of the district attorney in this case ... to identify Oglesby. Had the Commonwealth provided the appellee with Oglesby's name, Moose would then have had the opportunity to seek further information about Oglesby. Thus, in the case before us, the failure of the Commonwealth to *disclose* the identity of Oglesby as a witness impermissibly interfered with the *[sic]* Moose's ability to seek information concerning Oglesby's understanding with the Commonwealth.

*Id.* at 234, 602 A.2d at 1273 (emphasis added). Here, the Commonwealth unquestionably disclosed the existence of the Robles letter to Appellant's counsel by providing a police report whose sole subject was the letter, and counsel's failure to pursue the matter with the District Attorney is not a fault of the Commonwealth.

Moreover, we do not find that the Robles letter meets the test for "materiality" where there has been only a general request for *Brady* materials. Appellant's counsel asked Robles on cross-examination whether he had been released from material witness bail because he had an agreement with the District Attorney's office that he would cooperate with the police. Robles denied that he was given any deal in return for his release from jail, and stated that "whether I'm on bail or in jail, I still got to cooperate any way I put it, so it doesn't matter. Cooperating helps." Notes of Testimony, 11/20/97, p. 524. Robles testified that he was released from jail because he met the conditions of his bail and posted the requisite bond. Appellant's counsel also asked Robles whether he had ever received money from the Reading Police Department in exchange for his cooperation. Robles denied that he had been paid for his cooperation. The impeachment value of the February 1997 letter would be to suggest that Robles had made an agreement with the police to testify, and that he would fabricate testimony in order to fulfill any such agreement. When directly questioned about his cooperation, however, Robles denied that he had made any deal with the police. Although the letter may have been useful in undermining Robles' credibility, we do not conclude that such an impeachment strategy would have created a reasonable doubt that did not otherwise exist, particularly in light of Robles' testimony that his cooperation was not pursuant to any agreement with the police. *See Green, supra.*

### 2. *Police Report Regarding Robles' Knowledge of Appellant's Drug Activities*

Two days before the penalty phase of Appellant's trial was to begin, the Commonwealth disclosed to Appellant's counsel

the existence of a police report that described statements Robles made regarding Appellant's participation in Shawn Bridges' drug activities.[4] The Commonwealth produced a copy of this report to Appellant's counsel the day before the penalty phase was to begin. At the commencement of the penalty phase, Appellant sought to preclude the Commonwealth from introducing any evidence concerning the aggravating circumstance found at 42 Pa.C.S. § 9711(d)(14)—that the murder occurred in connection with illegal drug trafficking— as a sanction for the Commonwealth's late production of the report. The trial court denied Appellant's request, noting that the Commonwealth had produced the report and that Appellant had been on notice that the Commonwealth was seeking the death penalty on the basis of this aggravating circumstance. Appellant now claims that the Commonwealth engaged in misconduct by failing to produce this police report when Appellant made his general discovery requests nine months before trial.

We find no violation of *Brady* here, and there was no error made by the trial court denying Appellant's request to preclude the Commonwealth from presenting evidence of the relationship between the murders and Appellant's drug dealing activities. The Commonwealth produced the police report before the penalty phase of Appellant's trial. The basis for Appellant's complaint, therefore, is that the Commonwealth failed to comply in a timely fashion with his discovery request for statements of all witnesses that the Commonwealth intended to call at the sentencing phase, and that he was prejudiced by this late production of the report. In evaluating this claim, we must look at: (1) whether the discovery rules were violated; and (2) whether the trial court abused its discretion in not excluding evidence pursuant to Rule 305(E) of the Pennsylvania Rules of Criminal Procedure. *Commonwealth v. Jones*, 542 Pa. 464, 507, 668 A.2d 491, 512 (1995). The trial court has broad discretion in choosing the

4. This report, like the police report that described Robles' letter, had been filed under the Reading police file number for the Schuylkill Avenue murder.

appropriate remedy for a discovery violation. *Id., citing Commonwealth v. Rodgers*, 500 Pa. 405, 412, 456 A.2d 1352, 1355 (1983). Moreover, a defendant seeking relief from a discovery violation must demonstrate prejudice. *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 298 (1998). The production of statements made by the witnesses of the Commonwealth is within the discretion of the trial court. Pa.R.Crim.P. 305(B)(2)(a)(ii). In refusing to grant Appellant's request that the Commonwealth be precluded from introducing any evidence regarding the aggravating circumstance of Section 9711(d)(14), the trial court found that the Commonwealth had disclosed—several months before the trial—that it planned on calling Robles during the penalty phase. Further, the trial court noted that Appellant's investigator had interviewed Robles on previous occasions and had the opportunity to question Robles about his knowledge of Appellant's involvement in Bridges' drug activities, if he chose to do so. The trial court granted Appellant some relief by granting him a half-hour continuance to prepare for cross examination of Robles on the basis of this police report, and found this adequate in light of the advanced notice that Appellant had of the subject matter of Robles' testimony at the penalty phase. According to these circumstances, we find no abuse of the discretion of the trial court in refusing Appellant's request for further relief.

### B. *Recovery of Bullet from Appellant*

Appellant argues that the bullet[5] removed from Appellant, in the course of his surgery, and handed over to the police should have been suppressed, because the police did not obtain a warrant or a subpoena prior to requesting the bullet from the hospital. The trial court denied Appellant's pretrial mo-

---

5. The bullet recovered from Appellant was a .32 caliber bullet that, the Commonwealth's ballistics expert testified, did not come from the same 9–mm weapon that was used to shoot Gregory and Damon Banks. The Commonwealth presented testimony that Damon Banks had taken a .32 caliber pistol with him when he left with Bridges, Morales, and Appellant. The Commonwealth sought to discredit Appellant's version that Bridges had shot him, and instead prove that one of the victims, Damon Banks, had shot him.

tion to suppress the bullet. Our standard for reviewing suppression claims that the trial court decided in favor of the Commonwealth is well settled:

> we must determine whether the record supports the court's factual findings. In so doing, we consider only the evidence of the prosecution and so much of the evidence for the defense as, when fairly read in the context of the record as a whole, remains uncontradicted. Assuming that the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 524, 678 A.2d 342, 347 (1996) (citing *Commonwealth v. Hughes,* 536 Pa. 355, 367, 639 A.2d 763, 769 (1994); *Commonwealth v. Cortez,* 507 Pa. 529, 491 A.2d 111, *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985)). Appellant does not challenge the factual basis of the trial court's suppression decision, but instead claims that the trial court erred in concluding that Appellant had no constitutionally protected interest in the bullet removed from him.

In order for Appellant to have a constitutional claim against the removal of the bullet from him, he must show that the removal was done by, or at the behest of, a government agent. *See Commonwealth v. Kohl,* 532 Pa. 152, 166, 615 A.2d 308, 315 (1992) (administration of blood test is a search within the meaning of Article I, Section 8 of the Pennsylvania Constitution if performed by an agent of, or at the direction of the government); *see also Commonwealth v. Ellis,* 415 Pa.Super. 220, 223, 608 A.2d 1090, 1091 (1992), *allocatur denied,* 533 Pa. 623, 620 A.2d 489 (1993) (Fourth Amendment proscribes only government action, not searches by private individuals). In the absence of governmental action, the search or seizure in question cannot give Appellant ground for a claim of violation of constitutionally-protected interests under either the Federal or Pennsylvania Constitutions. Moreover, individual acts do not become imbued with the character of governmental action merely because they are later relied upon and used by the government in furtherance

of their objectives. *Commonwealth v. Hawkins,* 549 Pa. 352, 377–78, 701 A.2d 492, 505 (1997). To determine whether a particular search or seizure constituted governmental action, we must examine the purpose of the search, the party who initiated it, and determine whether the government acquiesced in it or ratified it. *Ellis, supra.*

Here, the removal of the bullet from Appellant was not at the behest of the police, but was for Appellant's medical well being as determined by the surgeon who treated Appellant on his arrival at Reading Hospital. While Appellant was already in the operating room undergoing surgery, Sgt. Johnson of the Reading Police requested that if the bullet were removed, he would like to have it. Under these circumstances, where a medical professional has made an independent decision that removal of the bullet was in the best interests of the patient, and where there was no antecedent direction from the authorities to do so, we cannot find the requisite governmental action to support Appellant's claims of violation of his constitutionally-protected interests.[6]

Having found that the removal of the bullet implicated no constitutional concerns, our inquiry shifts to examine whether the warrantless seizure of the bullet, after its removal from Appellant, violated any of Appellant's constitutionally-protected interests. An individual whose constitutionally protected rights are not violated cannot claim any injury by a warrantless police seizure.[7] In order to claim a constitutional-

---

6. The United States Supreme Court's decision in *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), is distinguishable. In that case, the authorities sought a court order to compel a suspect to undergo surgery to remove a bullet that the government wished to use as evidence. Because the surgery would "intrude substantially" on the defendant's protected interests, and would not be undertaken absent the government's motion, the Court held that the Fourth Amendment prohibited the government from compelling the operation. In Appellant's case, by contrast, removal of the bullet occurred irrespective of the wishes of the police, because Appellant's medical condition required it.

7. We have divided this principle into two concepts: (1) standing to litigate a suppression claim; and (2) the existence of a reasonable and legitimate expectation of privacy in the thing seized. *See Commonwealth v. Peterson,* 535 Pa. 492, 497, 636 A.2d 615, 617 (1993). Be-

ly-protected right in an item seized, the defendant must show: (1) that he had a subjective expectation of privacy; and (2) that the expectation is one that society is prepared to recognize as reasonable and legitimate. *See Commonwealth v. Gordon*, 546 Pa. 65, 71, 683 A.2d 253, 256 (1996). We consider the totality of the circumstances and carefully weigh the societal interests involved when determining the legitimacy of such an expectation. *Id.* at 71, 683 A.2d at 257. The circumstances in this case clearly demonstrate that Appellant had no reasonable expectation of privacy, which is to say, one that society would accept as legitimate, once the bullet had been removed from him. Accordingly, Appellant is entitled to no relief on this claim.

## C. *Suppression of Statements*

Appellant challenges the trial court's denial of his Motion to Suppress statements that he made to police beginning on December 8, 1996, and ending on December 12, 1996, claiming that the four statements he gave during this time were either given involuntarily, unknowingly, and unintelligently, in violation of his *Miranda* rights, or that they were the "fruit of the poisonous tree."

### 1. *The December 8, 1996 Statement*

The first statement that Appellant challenges occurred on December 8, 1996, immediately following the shooting and while Appellant was in the ambulance en route to the hospital for emergency treatment. The officers who arrived at the Queen City Restaurant found Appellant with a gunshot wound to the stomach. He was doubled over in pain, and vomiting a brown and red substance. They asked Appellant what had happened, and he stated that an individual at the A–Plus Mini Market in the Mount Penn area had shot him. Although in a great deal of pain, Appellant was lucid and able to converse with the officers and emergency personnel who treated him. One of the officers traveled in the ambulance and asked

cause we find that Appellant had no reasonable expectation of privacy in the bullet, we do not address whether Appellant had standing to seek suppression of this evidence.

Appellant who had shot him. Appellant identified the shooter as "James," and stated that the shooting happened after an argument he had with "James" about money. At the time of this questioning, the interrogating officer was not aware of the murders of Gregory and Damon Banks, and therefore did not suspect any connection between the shooting of Appellant and those murders.

Appellant argues that his physical condition was so severe that any statement given to police was not given knowingly, voluntarily, and intelligently. Appellant does not claim that this questioning amounted to a custodial interrogation requiring *Miranda* warnings, but alleges he was subjected to questioning by police. We have held that we will examine the totality of the circumstances surrounding statements given during noncustodial interrogations, "because a noncustodial interrogation 'might possibly in some situations, by virtue of some special circumstances,' result in an involuntary confession." *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 882 (1998) (quoting *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976)). When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion. *Nester*, 709 A.2d at 882 (citing *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996) (citing *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993))).

Here, the record supports the trial court's finding that Appellant's physical condition was not so impaired as to render him incapable of voluntarily describing to the police how he had been shot. Police questioned Appellant primarily because they believed he was the victim of a crime, and sought information to pursue their investigation of Appellant's shooting. Appellant was not, at that time, a suspect in Gregory and

Damon Banks' murder case, and was not questioned about those murders. The testimony at the preliminary hearing supports the conclusion of the trial court that Appellant was lucid and capable of responding to the officers' questions. Moreover, the result of this initial questioning was not a "confession" by Appellant of participation in the murders, but rather a false story designed to mislead police concerning the circumstances of Appellant's shooting. While Appellant contends that he was incapable of voluntarily giving statements to the police due to his "delirium," his presence of mind in fabricating a story about his shooting seriously undermines that claim. Considering the totality of the circumstances, we do not find that this noncustodial interrogation resulted in an involuntary confession from Appellant, and find no basis for suppressing these statements.

### 2. *The December 11, 1996 (Morning) Statement*

On December 11, 1996, Appellant made statements to police on two separate occasions admitting to participation in the murders of Gregory and Damon Banks. Appellant challenges the first statement as involuntarily given because he claims that he was subject to a custodial interrogation without the requisite *Miranda* warnings. The Opinion of the trial court describes its factual findings regarding the initial police interview of Appellant:

On December 11, 1996, Sgt. Walter Godshall and Lt. Robert Dunn of the Exeter Township Police Department went to the Reading Hospital to interview the Defendant. At this point no arrests had been made concerning the deaths of Damon and Gregory Banks. The officers arrived at the hospital at approximately 11 a.m. and inquired at the nurses [sic] station if they could speak with the Defendant. They were informed that they could speak with him and were directed to the Defendant's room which he shared with another patient. Upon entering the Defendant's room, they identified themselves as police officers with the Exeter Police Department and they were there to ascertain who shot the Defendant. Both officers wore business suits and

had revolvers concealed under their suit jackets. Lt. Dunn began the interview by asking the Defendant what had happened and, after the Defendant again told the version of events as previously indicated to other officers, Lt. Dunn told the Defendant he didn't believe him and left the room. Sgt. Godshall told the Defendant that they looked at the Defendant as a victim and they were trying to find out who shot him. He also stated that whoever did it has not been apprehended and is probably aware that the Defendant was still alive. At this point, the Defendant in a quiet voice stated, "Shawn shot me and left me lay there to die." Sgt. Godshall asked the Defendant if he was referring to the shootings on December 8 and asked the Defendant what happened. The Defendant stated he knew he was in trouble and then went on to give an incriminating oral statement admitting his involvement in the shooting deaths of Damon Banks and Gregory Banks. The Defendant implicated Shawn Bridges as the trigger man and Richard Morales as another individual involved. Sgt. Godshall asked clarifying questions during this statement. This statement was not recorded, reduced to writing, nor did Sgt. Godshall take notes while the Defendant spoke with him. The interview lasted approximately [one-half] hour.

Trial Court, Slip. Op., p. 9. In addition to these factual findings in the trial court's Opinion, the record indicates that the officers did not inform Appellant that he was free to decline to speak with them, and did not provide Appellant with *Miranda* warnings.

 Before an individual is subjected to a custodial interrogation, he must make a knowing and intelligent waiver of his privilege against self-incrimination and right to counsel after adequate warning as to those rights. *Commonwealth v. Williams*, 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Statements obtained by the police during a custodial interrogation without prior *Miranda* warnings are presumed to be given without a knowing and intelligent waiver, and are subject to suppression. To determine if a person

is in custody for *Miranda* purposes, however, depends on whether the person is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *Williams, supra, citing Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713, *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974).

We agree with the trial court that Appellant was not in custody, and therefore not subject to custodial interrogation, such that *Miranda* warnings were required. Appellant's inability to leave was not the result of any action of restraint by the police, but was due to his physical condition at the time. Although the officers displayed their badges, they were not in uniform and conducted the interview with the hospital door open and while another patient was in the room with Appellant. There was no suggestion by Appellant that he wanted police questioning to cease, or that he objected to the questioning. Further, Appellant offered his confession early in the interrogation, and gave an extensive narration of his involvement in the murders of Gregory and Damon Banks without repeated prompting by Sgt. Godshall. When Appellant became distraught at the end of his confession, Sgt. Godshall terminated the interview and asked Appellant's consent to return later that afternoon to record Appellant's statement. Appellant agreed to give a recorded statement. In these circumstances, we do not find that Appellant's freedom of action was so restricted by the police questioning that he could reasonably believe that he was not free to terminate the interview. Because we find that Appellant was not subject to a custodial interrogation, no *Miranda* warnings were required.

### 3. *The December 11, 1996 (Afternoon) Statement*

Later the afternoon of December 11, 1996, the police returned to the hospital to record Appellant's confession. Before giving his statement, Appellant was apprised of his *Miranda* rights. Appellant acknowledged that he understood his rights and that he was willing to give the statement without consulting an attorney. Appellant reviewed the warn-

ing and waiver provisions of the form on which his statement was to be recorded, and signed the waiver portion of the form. Recognizing that he was properly advised of his *Miranda* rights, Appellant now asserts that this statement was the "fruit of the poisonous tree" of his previous, allegedly-tainted statement. We have found, however, that Appellant's earlier statement was not the product of a violation of his constitutional rights, and therefore we do not find any "poisoned tree" of which Appellant's later statement would be the "fruit."

### 4. *The December 12, 1996 Statement*

Appellant also challenges the statement he made to police shortly after midnight on December 12, 1996, on the grounds that his *Miranda* warnings were "stale" by the time he repeated his confession to the police. Following the recording of his confession on the afternoon of December 11, 1996, the police officers left Appellant, unguarded, at the hospital. He had not been placed under arrest. Later that afternoon, the police learned that Appellant had checked himself out of the hospital against his physician's advice. Suspecting that Appellant was staying at George Robles' residence, Detective Vega of the Reading Police called Robles and asked him whether Appellant was with him. Robles confirmed that Appellant was with him, and Detective Vega spoke with Appellant. Detective Vega asked Appellant if he would go to the District Attorney's office so that they could talk about the possibility of retaliation from Shawn Bridges, and about the murders of Gregory and Damon Banks. Appellant agreed to go the District Attorney's office, but asked if friends could accompany him. The police transported Appellant and two of his friends to the District Attorney's office, for the purpose of administering a polygraph examination that Appellant had agreed to undergo. At approximately 7:20 p.m., Detective Stajkowski gave Appellant *Miranda* warnings and conducted a pre-polygraph interview of Appellant. Due to Appellant's physical condition, however, Detective Stajkowski did not administer the polygraph test. At about midnight, Detective Schade of the Reading Police and Detective Bailey of the Exeter Police took Appellant to another conference room and

questioned Appellant about Gregory and Damon Banks' murders. The officers did not give Appellant *Miranda* warnings prior to this questioning.

██ Whether the police were required to give Appellant *Miranda* warnings depends on whether this interview constituted a custodial interrogation. We find that this questioning did not amount to a custodial interrogation. Appellant agreed to accompany the police to the District Attorney's office, and was not placed in handcuffs or otherwise placed under arrest. The officers permitted Appellant to bring two of his friends with him, and these individuals were present at the District Attorney's office during part of the questioning. Appellant was left unattended at various times, and was permitted to take breaks when needed. When Appellant requested that the interview stop, the police ceased questioning him and offered to take him to the hospital or, when Appellant refused to go the hospital, to return him to Robles' house. In these circumstances, we do not find that Appellant was in custody such that *Miranda* warnings were required prior to the interview. Because we conclude that there was no custodial interrogation, Appellant is entitled to no relief for the police's failure to "refresh" the *Miranda* warnings that the officers, in an abundance of caution, had given Appellant when he first arrived at the District Attorney's office.

## D. *Prejudicial Effect of Appellant's Statement to Police*

Appellant contends that the trial court erred in permitting testimony regarding Appellant's statements to the investigating officers that he did not understand why Bridges continued to speak with Gregory and Damon Banks while standing on the front porch of their house and that, if he were in Bridges' position, he would have shot them at that moment and then would have killed the lady who was unloading her packages next door so that there would not have been any witnesses. Admission of the portion of the statement concerning the shooting of the neighbor, Appellant contends, was so prejudicial as to require a new trial.

242

Evidentiary rulings are committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Cohen,* 529 Pa. 552, 563, 605 A.2d 1212, 1218 (1992) (citing *Commonwealth v. Jermyn,* 516 Pa. 460, 533 A.2d 74 (1987)). Evidence is relevant and, therefore, admissible if it logically tends to establish a material fact in the case, if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. Bronshtein,* 547 Pa. 460, 480, 691 A.2d 907, 917 (1997) (citing *Commonwealth v. LaCava,* 542 Pa. 160, 172–76, 666 A.2d 221, 227–28 (1995)). A trial court may exclude otherwise admissible evidence, however, if it concludes that the prejudicial effect of that evidence outweighs its probative value. *See Commonwealth v. Boyle,* 498 Pa. 486, 494, 447 A.2d 250, 254 (1982).

We do not discern an abuse of discretion by the trial court in admitting Appellant's statement that he would have shot Gregory and Damon Banks on their front porch and would have shot the neighbor/witness. The portion of the statement regarding the killing of Gregory and Damon Banks indicates Appellant's intent to kill, and the Commonwealth must establish premeditation as an element of first degree murder. *See* 18 Pa.C.S. § 2502(a), (d). Clearly, Appellant's statement that he would have killed Gregory and Damon Banks at that moment makes it more probable that he intended to kill them later that day. The statement is therefore relevant, and because it constitutes evidence of the element of intent for first-degree murder, we cannot find that the statement's prejudicial impact, assuming it had any, outweighed its significant probative value. Moreover, we do not find that the trial court abused its discretion in admitting that portion of the statement regarding the killing of the neighbor. In addition to being charged with the murders of Gregory and Damon Banks, Appellant was charged with conspiracy to commit murder. His statement that he would have shot a witness to the murders is proof of his intent to participate in the conspiracy, and is therefore relevant. We do not find an

abuse of the discretion of the trial court in ruling that the prejudicial impact of this statement did not outweigh its probative value.

E. *Sufficiency of Evidence of Aggravating Circumstances*

At the penalty phase, the Commonwealth presented the testimony of George Robles that Appellant was the "enforcer" for co-defendant Bridges' drug operations, and that the murder was in connection with drug sales. The Commonwealth presented the aggravating factor of Section 9711(d)(14)—that the murder was committed in connection with drug activity. The jury found that the aggravating circumstances outweighed the mitigating circumstances for the murder of Damon Banks, and at least one aggravating factor and no mitigating factors for the murder of Gregory Banks. While the jury found that Appellant had a mitigating factor of no significant criminal history at the time of the murder of Damon Banks, the jury found that was no longer true when Gregory Banks was murdered. Upon questioning from the judge, the jurors stated that because there was testimony that Damon Banks died before Gregory Banks, Appellant would have had a "criminal history" (i.e., the murder of Damon Banks) when Gregory Banks was killed.

Appellant contends that there was insufficient evidence to establish the aggravating circumstance pursuant to Section 9711(d)(14). Our standard for reviewing sufficiency of the evidence claims is that we must view all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as the verdict winner and must determine whether the evidence was such as to enable the factfinder to find that all of the elements were established beyond a reasonable doubt. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129 (1996). The aggravating circumstance found at Section 9711(d)(14) provides:

[a]t the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in vio-

lation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

42 Pa.C.S. § 9711(d)(14).

■ George Robles testified at the penalty phase that Appellant was the "tough guy" whom Shawn Bridges used as his "protection" in his crack cocaine distribution operation. Robles had personally witnessed Appellant sell crack cocaine. Courtney Johnson, a friend of Damon and Gregory Banks, and a participant in the robbery of Bridges' girlfriend, testified that he, Damon, and Gregory Banks went looking for "drugs and money" when they went to rob Bridges' apartment. N.T., 1/20/97, p. 491. Robles testified that, according to conversations he had with Appellant, Gregory and Damon Banks' murders occurred because "they tried to take Shawn's drugs. That's the consequence in that business." Moreover, Appellant admitted in his statements to the police that the ruse employed by Bridges to get Gregory and Damon Banks to accompany them was that Bridges was leaving town for three to five days and that Bridges was showing the victims where his drugs were hidden so that Gregory and Damon Banks could "watch over his business" in Bridges' absence. N.T. 1/21/07, p. 605. This testimony was sufficient to support the jury's finding of the aggravating circumstance pursuant to 42 Pa.C.S. § 9711(d)(14).

### III. CONCLUSION

We find no errors as alleged by Appellant. There was sufficient evidence to support the jury's determination of Appellant's guilt, and sufficient evidence to support the aggra-

vating circumstances found by the jury in imposing the death penalty. Accordingly, we affirm [8] the Judgment of Sentence.[9]

Justice ZAPPALA concurs in the result only.

---

8. Pursuant to the 1997 Amendments to 42 Pa.C.S. § 9711(h), which was effective prior to the date of Appellant's trial, we do not conduct a comparative proportionality review of Appellant's sentence. *See Commonwealth v. Gribble*, 550 Pa. 62, 91, 703 A.2d 426, 441 (1997).

9. The Prothonotary of the Supreme Court of Pennsylvania is directed to transmit, within 90 days, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor and to notify the Secretary of Corrections, pursuant to 42 Pa.C.S. § 9711(i).