J-A25026-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRANDON TREMAYNE PIERCE | |
| Appellant | No. 2452 EDA 2013 |

Appeal from the Judgment of Sentence of February 13, 2013
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0007038-2011

BEFORE:  DONOHUE, J., WECHT, J., and PLATT, J.[*]

MEMORANDUM BY WECHT, J.:                **FILED NOVEMBER 03, 2014**

Brandon Pierce appeals his February 13, 2013 judgment of sentence. We affirm.

On November 14, 2012, a jury convicted Pierce of, *inter alia*, first-degree murder, 18 Pa.C.S. § 2502(a).  In its March 7, 2014, Pa.R.A.P. 1925(a) opinion, the trial court summarized the evidence that was presented at Pierce's murder trial as follows:

> On Wednesday, July 20, 2011 at 12:02 [a.m.], Norristown police responded to a call of a shooting in the area of Green and East Basin Streets.  Upon arrival, the police found sixteen[-]year[-]old Dominique Devlin ("Dominique") suffering from multiple gunshot wounds.  She was transported to nearby Montgomery Hospital where she was pronounced dead at 12:32 [a.m.]

---

[*]    Retired Senior Judge assigned to the Superior Court.

Shortly before the shooting, between 11:30 [p.m.] on the prior evening and midnight [on] July 20, 2011, Glenda Baez ("Baez") was with several friends in the backyard of a home in the 1100 block of Green Street. From there, she saw Dominique flirting with a black male while standing at the rear of a 1992 Ford Probe parked on Basin Street. After a short time, Dominique and the male walked down an alley that runs between and parallel to Dekalb and Green Streets. Within a few minutes of their walking into the alley, Baez heard three gunshots. She then saw Dominique run out from behind a brick building where she collapsed. Baez did not see the black male after the shooting. Baez's testimony was echoed by another witness, Stephanie Bolger, who likewise saw Dominique by the Ford Probe with a black male with whom she walked into the alley off Basin Street. After which and within minutes, Bolger heard gunshots [and] a scream, and saw Dominique run from the alley and collapse.

\* \* \*

At the crime scene, police followed the blood trail left by Dominique to the end of the alley where they found two chairs facing each other. Along the nearby walkway of Dekalb Street[,] police recovered a Mauser 6.39 semi-automatic handgun as well as a spent .25 [Automatic Colt Pistol ("ACP")] shell case. Detective John Finor ("Det. Finor"), a ballistics expert, confirmed that the Mauser has the capacity to fire .25 ACP ammunition, and that both the projectiles recovered from Dominique's body and the shell case from the scene were fired by the Mauser. In short, it was the murder weapon. Close by the handgun, police recovered a dark Adidas brand T-shirt, a running pants set, a dark Villanova University baseball cap, and a plastic bottle containing bleach. The T-shirt and baseball cap were wet with bleach which, according to Laura M. Cronin, the Commonwealth's expert in forensic biology, is known to destroy DNA. Police also recovered a cell phone later determined to be Dominique's. Two witnesses, Jerome Purdy and Shamar Benjamin ("Benjamin"), saw and spoke with Dominique shortly before she was murdered. Dominique told both that she was heading to meet her ex-boyfriend, Brandon Pierce. Benjamin walked with Dominique toward the crime-scene where Dominique told Benjamin she was meeting [Pierce]. A fingerprint taken from the Ford Probe (whose owner testified he did not know [Pierce] and [Pierce] had never been in his car) matched [Pierce's] print. DNA found on the black Adidas pants,

black Adidas shirt, Villanova baseball cap, and gun grips of the murder weapon was consistent with [Pierce's] DNA. Most damning in this regard were the admission of cell phone records and texts exchanged between Dominique and [Pierce] which confirmed their plan to meet that night at the time and place of the murder[,] ostensibly for a sexual encounter.

The evidence also revealed that, a few weeks before the murder[,] on July 6, 2011, there was a home invasion robbery of [Pierce's] home, during which shots were fired at [Pierce]. As a result of which, [Pierce] moved from his house and was taken in by a friend's family. One of the residents of that house, Jamil Harrell ("Harrell"), was away for a few days and returned to find [Pierce] living in the house. [Pierce] told Harrell of the home invasion and that the robbery was orchestrated by Dominique. He went on to tell Harrell, "[T]he bitch Dom tried to set me up, but she going to pay" at which point he pulled out a small semi-automatic pistol from his pocket which Harrell identified as the Mauser used to kill Dominique. Harrell also identified the shirt and baseball cap found at the scene as identical to clothing worn by [Pierce]. A number of witnesses, including Harrell, saw [Pierce] walking away from the scene of the murder shortly after the murder. At that point, these witnesses say, [Pierce] was wearing cargo shorts, a black T-shirt, and black shoes. These witnesses also say that when they saw [Pierce] shortly after the murder he was acting out of character.

As part of this mountain of evidence, the Commonwealth called Cory Collins ("Collins") who *corroborated* Harrell's testimony as to [Pierce's] motive and [Pierce] being in possession of the murder weapon. Collins also testified that [Pierce] told him [that Pierce] had committed the murder in retaliation for the home invasion robbery, and repeated details of the murder as related to him by [Pierce]. In response, the defense vigorously attacked Collins' credibility. The defense exploited Collins' admitted failure to come forward to police with [Pierce's] damning admissions and other information until *after* Collins himself had been arrested in Conshohocken, Montgomery County. The defense emphasized that, as a result of that arrest, Collins was facing serious charges including carrying a firearm (a loaded Glock 9mm) without a license, disorderly conduct, and DUI—all carrying mandatory prison sentences—for which Collins entered into a proffer with the Commonwealth wherein the Commonwealth promised not to seek the mandatory sentences in exchange for his cooperation.

The defense was also permitted, over the Commonwealth's objection, to bring out in cross-examination that[,] a year after that first gun charge, Collins had an open case in Philadelphia involving a litany of felony charges, including aggravated assault and kidnapping. In addition, the defense was permitted to confront Collings with the affidavit of probable cause in that case, which asserted that Collins forcibly refused to let his girlfriend leave his vehicle for several hours, repeatedly threatening her by putting a handgun in her mouth saying he "would blow her brains out" and that she would be "just another dead black bitch." The defense further pointed out that while bail was originally $200,000.00, the Commonwealth later agreed to house arrest and then vacated the house arrest all together. The implication being that, notwithstanding the Montgomery County District Attorneys' representations in the proffer letter that it had no control over the Philadelphia case, Colling was, indeed, getting favorable treatment in exchange for his cooperation and testimony. Finally, the defense also sought to impeach Collins with his prior inconsistent Grand Jury testimony. In short, the defense was flush with significant material evidence which placed Collins' credibility in serious jeopardy.

\*    \*    \*

[Pierce took the stand in his own defense.] [Pierce] recalled the night of Dominique's murder. He had spent that afternoon buying drugs in Philadelphia with friends and then drinking and doing those drugs on the drive back to Norristown. According to [Pierce], he fell asleep around 5:00 [p.m.] and was awoken by a call from his girlfriend, Courtney Watson, around 11:00 [p.m.] that night. He also acknowledged having received a series of phone calls and text messages from Dominique, with whom he had remained sexually involved. [Pierce admitted that] he had set out to meet Dominique around 11:30 [p.m.] for a sexual encounter. . . .

First, as it was the middle of July, [Pierce] conceded it was a "hot" summer night. Notwithstanding that . . . [Pierce] acknowledged that he had been wearing multiple layers of clothing, including a tank top, a T-shirt, cargo shorts, a pair of sweatpants, as well as a baseball cap—all of which were dark colored. Presumably attempting to capitalize on the Commonwealth's evidence that [Pierce] had murdered Dominique in retaliation for her orchestration of an invasion and robbery of his home, the story . . . was that he was, yet again,

set up by Dominique—a victim and not a perpetrator as the Commonwealth had cast him.

[Pierce] claimed that Dominique, under the guise of agreeing to meet him at the usual place for a sexual encounter, lured him into that fateful alley to be robbed by an unknown accomplice who, in a fit of rage over [Pierce] not having any money on him to steal, shot Dominique. In presenting this story the jury, however, [Pierce] admitted both that *he* was the male who was with Dominique in the alley when she was shot and that it was *his* clothing that was found at the scene of the murder covered in bleach.

The details, as told by him, were that he and Dominique had been texting about getting together for Dominique to perform fellatio on him at the usual place where they would meet for such encounters—the alleyway where the murder took place. Once there, Dominique went to take his sweatpants down but he stopped her to first relieve himself. As he got up from the chair he was sitting on (he and Dominique had been sitting, facing each other on two chairs he had found) a man jumped out of the bushes and hit him over the head with a hard object. He continued:

A: After I was hit with the object, I basically went down and pretended to be unconscious. I laid on my side, and I just sat still and let the person feel inside my pockets. My phone was pulled out of my pockets, and my pants were pulled off. And he kept touching me, I could hear him start saying things like, where the money at or where the bread at. And I was scared, so I didn't say nothing. But I basically tried to listen to see what was going on as much as possible. I didn't want to open my eyes and look to make it seem as if I was still around. I just -- I tried to avoid having a part to play in this situation as best as possible, so I just continued to stay down.

Q: What happened after that?

A: After a while, like he just kept repeating the same things. Then I heard her say out of her mouth that he always got money on him or something like that. And then it was just like -- he started getting frustrated and he started grunting. The next thing I know, I heard him say something, You nut ass bitch. And then I heard the first shot. And after the first shot I heard her scream. And

then I could like feel her run by me. Almost by the way I was laying, it was like the way the wind shifted, I could feel her run by me. And after the first shot, her voice just continued to travel. And then I heard like three more shots. But her voice just continued to travel. I could hear her voice.

So he picked me up and he sat me in the chair, he pulled my shirt off of me. After he pulled my [shirt] off of me, he poured bleach overtop -- well, he poured something overtop of my head. At the time I didn't know what it was. I thought he pissed on me, truthfully. But after that, I had felt my hand raised up. And as I feel my hand raised up, I feel my hand touching something, and the next [thing] I know, I panicked and I pushed it forward and I ran out towards Dekalb street.

And as I ran out towards Dekalb Street, I ran across the street and I looked back towards the way I was coming from. And after that, I just --  like I kept running until I got to Spruce Street. As I got to Spruce Street, I started walking. And as I was walking, I kept looking back and I kept looking back. And finally, I seen somebody start walking down the street. As I seen them walking down the street, they made a left. Coming down Dekalb, they made a left onto Spruce --

Q: And where did you go?

A: -- And walked in the alleyway. I just kept walking up Spruce Street.

Q: Now, can you describe the individual that hit you on the side of your head?

A: Truthfully, no.

Q: Can you give me an approximate size of that individual compared to you?

A: Bigger than me.

To explain his DNA on the murder weapon, [Pierce] testified as follows:

A: After the conversation is basically when he continued to get frustrated. And that's when I heard, you know, you nut ass bitch, and then I heard the shots.

Q: And then what happened?

A: And then after that, I continued -- I felt her like run by me. By the way I was laying down, she was sitting towards Green. So I guess as she got up, she ran by. And when she ran by, it was like I could feel her running by me, but I could keep hearing her voice travel as I heard the last three shots.

Q: And then what happened to you?

A: After that, I was placed into a chair, he pulled my shirt off, and he poured what I later found was bleach on me and placed something in my hand. He picked up my hand and at the time I didn't know what it was, but putting two and two together after I heard the shots, I figured it was a gun, so I pushed it forward and just continued to run.

[T]he Commonwealth's evidence directly contradict[ed Price's] version of the actual shooting. At trial, Dr. Walter Hofman ("Dr. Hofman"), the Montgomery County Coroner and an expert in the field of forensic pathology, testified that Dominique died as a result of two gunshot wounds to her chest—both of which were "fired from the front" and "went from front to back." More specifically, Dr. Hofman stated "[g]unshot number one was in the sternal notch. That's the little cavity at the top of your breastbone.["] While Dr. Hofman could not specifically confirm, based on his examination, whether Dominique was sitting or standing when she was shot, he did opine that the path of the bullet "from up to down, at an angle of about 30 degrees," suggests she may have been leaning forward when struck. Dr. Hofman's findings [were] consistent with the Commonwealth's theory that [Pierce] first shot Dominique when she was still seated in her chair.

"[G]unshot number two was right in the chest." This gunshot wound to Dominique's chest had "minimal deflection," with an angle of about ten degrees, suggesting to Dr. Hofman that it struck Dominique when she was in a more upright position. He also found a third, atypical gunshot wound involving Dominique's right little finger and another graze gunshot wound on her right third finger. Dr. Hofman's findings [were] consistent with the

Commonwealth's theory that [Pierce] first shot Dominique as she sat in the chair, and again when she stood to flee holding her right hand up defensively. Moreover, his findings directly contradict[ed Pierce's] claim that the alleged robber had fired a second shot into Dominique's back as she fled the scene.

Trial Court Opinion ("T.C.O."), 3/7/2014, at 1-9 (emphasis in original; footnotes and references to notes of testimony omitted).

On February 13, 2013, the trial court sentenced Pierce to life imprisonment on the first-degree murder conviction. On February 25, 2013, Pierce timely filed a post-sentence motion, in which he alleged, *inter alia*, that the Commonwealth withheld exculpatory information in violation of **Brady v. Maryland**, 373 U.S. 83 (1963). Specifically, Pierce contended that the Commonwealth had not disclosed to him information that was material to impeaching the credibility of Commonwealth witness Cory Collins.

On May 21, 2013, the trial court held a hearing on Pierce's motion. The following is a summary of the relevant testimony elicited at that hearing:

After being convicted, Pierce was placed on a bus returning to the jail, on which Pierce engaged in a conversation with an individual named Darious Andrews. Andrews related to Pierce that, at some point before Pierce's trial, he had participated in a conversation with his attorney, the assistant district attorney ("ADA") assigned to prosecute Pierce, and other individuals

involved in the investigation and prosecution of Pierce regarding the charges against Pierce.[1]  Andrews stated that, during that conversation, he had conveyed to the ADA that Collins was a compulsive liar, and that Collins frequented the area where the murder occurred but no longer does so.

After the meeting, the ADA drafted and sent an email to Andrews' attorney indicating that the ADA believed that the conversation may have produced some information that may require disclosure under *Brady*'s mandate.  That email was never disclosed either to Pierce or his counsel.

The ADA explained that, as part of a profane rant, Andrews had referred to Collins as a "fucking snitch," a "fucking liar," and "a "fucking rat." However, the ADA claimed that Andrews never used the term "compulsive liar."  Regardless, Andrews conveyed to the ADA that Collins was well-known in the community as a "snitch."

Additionally, the ADA explained that, in the email that he sent to Andrews' counsel, the material that he was concerned might fall under *Brady*'s purview was not the information pertaining to Collins' reputation on the street as a snitch.  Rather, the ADA was referring to the fact that Andrews had denied seeing Pierce with a gun over a year prior to the murder and to the fact that Andrews denied supplying Pierce with the murder

_____

[1]    Allegedly, Andrews was brought to the attention of the ADA because the police suspected that Andrews had provided Pierce with the weapon that was used in the murder.

weapon. Upon consideration of the issue with other members of his office, the ADA did not provide the information regarding Andrews denying seeing Pierce with a gun to the defense. The fact that Andrews denied providing Pierce with the weapon was disclosed in the form of grand jury testimony. The ADA did not disclose to the defense in any form material regarding Andrews' allegations regarding Collins being a liar, and being so known in the community.

On May 31, 2013, the parties reconvened before the trial court to present oral argument on Pierce's motion. At the conclusion of the hearing, the trial court directed the parties to file memoranda of law in support of their respective arguments. On July 25, 2013, after the parties filed their respective memoranda, the trial court entered an order denying Pierce's post-sentence motion.

On August 22, 2013, Pierce timely filed a notice of appeal. In response, the trial court directed Pierce to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On September 19, 2013, Pierce timely filed a concise statement. On March 7, 2014, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Pierce raises one issue for our review: "Does a blatant, intentional violation of Rule 573(b)(i)(a) of the Pennsylvania Rules of Criminal Procedure [w]arrant a new trial or arrest of judgment[?]" Brief for Pierce at 4.

Although Pierce identifies Rule 573 for the basis of his argument in his question presented, except for citing the language of the rule at the beginning of his argument, *see* Brief for Pierce at 8, Pierce focuses all of his attention of his argument upon whether the ADA's actions violated ***Brady***.

In ***Brady***, the United States Supreme Court held that "suppression by the prosecution of favorable evidence to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." ***Brady***, 373 U.S. at 87. ***Brady***'s mandate is not limited to pure exculpatory evidence; impeachment evidence also falls within ***Brady***'s parameters and therefore must be disclosed by prosecutors. ***U.S. v. Bagley***, 473 U.S. 667, 677 (1985). However, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." ***Id.*** at 675.

To establish a ***Brady*** violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. ***Commonwealth v. Dennis***, 17 A.3d 297, 308 (Pa. 2011). The burden rests with the defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." ***Commonwealth v. Paddy***, 15 A.3d 431, 451 (Pa. 2011). The withheld evidence must have been in the exclusive control of the prosecution at the time of trial. No

*Brady* violation occurs when the defendant knew, or with reasonable diligence, could have discovered the evidence in question. Similarly, no violation occurs when the evidence was available to the defense from a non-governmental source. *Id.*

Instantly, Pierce contends that the Commonwealth violated *Brady* by failing to disclose Andrews' comments to the ADA that Collins was a liar, and was well known as such in the community. This information, undeniably relevant to impeaching the credibility of Collins, one of the Commonwealth's key witnesses, falls squarely within *Brady*'s purview. *Bagley*, *supra*. Additionally, based upon our review of the record, it is clear that the Commonwealth failed to disclose this information to the defense. There is a question as to whether this information was within the exclusive province of the Commonwealth such that Pierce could not have obtained it from a non-governmental source. However, we need not answer this more complicated question because, even if the information was within the Commonwealth's exclusive possession, we hold that Pierce nonetheless cannot demonstrate that the evidence was material for *Brady* purposes, *i.e.*, that he was prejudiced by the Commonwealth's failure to disclose the material.

To demonstrate prejudice, "the evidence suppressed must have been material to guilt or punishment." *Commonwealth v. Gibson*, 951 A.2d 1110, 1126 (Pa. 2008). Evidence is material under *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the trial could have been different. *Kyles v. Whitley*, 514 U.S. 419, 433-34

(1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *Commonwealth v. McGill*, 832 A.2d 1014, 1019 (Pa. 2003) (quoting *U.S. v. Agurs*, 427 U.S. 97, 109-10 (1976)). The relevant inquiry is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. To prove materiality where the undisclosed evidence affects a witness' credibility, a defendant "must demonstrate that the reliability of the witness may well be determinative of [the defendant's] guilt or innocence." *Commonwealth v. Johnson*, 727 A.2d 1089, 1094 (Pa. 1999). "A reviewing court is not to review the evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record." *Dennis*, 17 A.3d at 309 (citing *Commonwealth v. Small*, 741 A.2d 666, 675-76 (Pa. 1999)).

Here, Pierce cannot demonstrate materiality for *Brady* purposes for two reasons. First, the evidence against Pierce was so overwhelming that the introduction of additional impeachment evidence against a witness would not have been determinative of Pierce's guilt or innocence. *Johnson*, *supra*. Second, as the trial court explained, Pierce already had a substantial amount of impeachment information that he utilized against Collins during trial such

that it cannot reasonably be said that additional impeachment information would have impacted the trial in any discernible way.

We turn first to the overwhelming evidence against Pierce at trial. We note that "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt." *Commonwealth v. Copenhefer*, 719 A.2d 242, 259 (Pa. 1998) (citing *Commonwealth v. Green*, 640 A.2d 1242, 1245 (Pa. 1994)). Instantly, there is no reasonable doubt regarding Pierce's guilt.

The evidence at trial established that, through text messaging, Pierce orchestrated a meeting between himself and the victim for the exact location and at the same time at which the victim was observed before being murdered. The victim told two of her friends that she was going to meet Pierce that evening. After the murder, Pierce's fingerprints were found on the Ford Probe, a car that witnesses described seeing the victim and an unknown male standing near shortly before the murder. Pierce's DNA was recovered from the pants, shirt, and baseball cap, each of which were found at the murder scene and doused with bleach, an agent used to destroy DNA. Pierce was observed walking away from the murder scene wearing different clothes than what he had on when he was initially sighted. Pierce admitted that he wore two sets of clothes to the meeting with the victim.

Moreover, Pierce's DNA was found on the grip of the weapon that was determined to be the murder weapon. At trial, the Commonwealth alleged that Pierce murdered the victim in retaliation for a prior home invasion/robbery in which Pierce believed the victim had played a vital role. Collins not only confirmed this motive at trial, but he also testified that Pierce confessed to committing the murder and admitted that it was done in retaliation for the robbery.

Based upon the text messages, the DNA evidence, and Pierce's confession, the evidence was so overwhelming that no reasonable doubt existed as to Pierce's guilt to enable this Court to conclude that additional evidence pertaining to Collins' credibility was material for ***Brady*** purposes. ***See Copenhefer***, *supra*.

We now turn to our second reason for concluding that Pierce has not established materiality: Pierce already had in his possession and utilized at trial an abundance of impeachment material against Collins, to the degree that additional impeachment information would not have impacted the verdict in any material way. In support of this conclusion, we need only reiterate the trial court's description of Pierce's cross-examination of Collins at trial:

> As part of this mountain of evidence, the Commonwealth called Cory Collins ("Collins") who *corroborated* Harrell's testimony as to [Pierce's] motive and [Pierce] being in possession of the murder weapon. Collins also testified that [Pierce] told him [that Pierce] had committed the murder in retaliation for the home invasion robbery, and repeated details of the murder as related to him by [Pierce]. In response, the defense vigorously attacked

Collins' credibility. The defense exploited Collins' admitted failure to come forward to police with [Pierce's] damning admissions and other information until *after* Collins himself had been arrested in Conshohocken, Montgomery County. The defense emphasized that, as a result of that arrest, Collins was facing serious charges including carrying a firearm (a loaded Glock 9mm) without a license, disorderly conduct, and DUI—all carrying mandatory prison sentences—for which Collins entered into a proffer with the Commonwealth wherein the Commonwealth promised not to seek the mandatory sentences in exchange for his cooperation.

The defense was also permitted, over the Commonwealth's objection, to bring out in cross-examination that a year after that first gun charge, Collins had an open case in Philadelphia involving a litany of felony charges, including aggravated assault and kidnapping. In addition, the defense was permitted to confront Collings with the affidavit of probable cause in that case, which asserted that Collins forcibly refused to let his girlfriend leave his vehicle for several hours, repeatedly threatening her by putting a handgun in her mouth saying he "would blow her brains out" and that she would be "just another dead black bitch." The defense further pointed out that while bail was originally $200,000.00, the Commonwealth later agreed to house arrest and then vacated the house arrest all together. The implication being that, notwithstanding the Montgomery County District Attorneys' representations in the proffer letter that it had no control over the Philadelphia case, Colling was, indeed, getting favorable treatment in exchange for his cooperation and testimony. Finally, the defense also sought to impeach Collins with his prior inconsistent Grand Jury testimony. In short, the defense was flush with significant material evidence which placed Collins' credibility in serious jeopardy.

T.C.O. at 4-5. Our review of the trial transcript confirms the trial court's characterization of Pierce's cross-examination of Collins. Hence, it is clear that Pierce not only had the opportunity to vigorously challenge Collins' credibility, but he readily accepted that opportunity. Nothing in the record or in Pierce's arguments suggests to us that the absence of even more

impeachment material would have impacted the outcome of the trial, or that the absence of this material alters our confidence in the verdict. **See Kyles**, *supra*.

For these reasons, Pierce has not demonstrated that the information that the ADA failed to disclose to him was material for **Brady** purposes. Consequently, his argument necessarily fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/3/2014</u>