J-A35035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| GREGORY BROWN, | |
| Appellee | No. 289 WDA 2014 |

Appeal from the PCRA Order Entered February 19, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):
CP-02-CR-0006028-1996
CP-02-CR-0008170-1996

BEFORE: BENDER, P.J.E., DONOHUE, J., and ALLEN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 20, 2015**

The Commonwealth appeals from the order entered February 19, 2014, granting Gregory Brown's (Appellee) petition for a new trial filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq*. The PCRA court's order overturned Appellee's conviction for three counts of second degree murder, two counts of arson, and one count of insurance fraud. These offenses were related to the burning of his and his mother's rental residence that resulted in the death of three firefighters. The PCRA court granted Appellee a new trial because, *inter alia*, the Commonwealth had withheld impeachment evidence concerning two critical witnesses who had testified against Appellee during his 1997 jury trial. After careful review, we affirm.

The evidence at trial and subsequent proceedings revealed the following: At approximately 12:22 a.m., on February 14, 1995, firefighters responded to a house fire at 8361 Bricelyn Street in Pittsburgh. Appellee's mother, Darlene Buckner, rented the home, and both she and Appellee had lived at the address since 1990. Three months before the blaze, Buckner, for the first time, had purchased $20,000 in renter's insurance.

Six firefighters entered the home in order to put out the fire. Three of those firefighters, Thomas Brooks, Patricia Conroy, and Mark Kolenda, died after becoming trapped in the basement area of the home after a stairway collapsed. The fire was determined to have been intentionally set in the basement; samples from the basement, analyzed by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), confirmed the presence of gasoline. Investigators also located a gas can in the basement close to where an expert testified that gasoline had been ignited. As part of the investigation, ATF offered a reward of $15,000 for information leading to an arrest and conviction. This information was broadcast on the news and flyers were distributed to neighbors on Bricelyn Street.

Buckner maintained that she and Appellee, a juvenile at the time, had left the home at approximately 11:45 p.m. to shop at a local Giant Eagle grocery store, and did not return until after firefighters had arrived. There was evidence supporting this alibi produced by the defense in the form of a Giant Eagle receipt issued at 12:37 a.m. on February 14, 1995. However, Pittsburgh Police Officer Duane Workman testified that he saw Buckner

return to her house, alone, around 1:00 a.m.  An additional witness, Keith Wright, a neighbor, testified that he observed Appellee standing across the street from the house when smoke began to escape from the basement of the home.  According to Wright, Appellee stood on the sidewalk for a minute or two before walking across the street and up a set of steps to a landing in a neighbor's yard.  Wright stated that Appellee stayed in that spot for three or four minutes watching his house.  The testimony of Workman and Wright did not affect Buckner's alibi; indeed, Workman's testimony could have been understood to support it.  However, their testimony did tend to undermine Appellee's alibi.

Wright did not come forward to speak with law enforcement until eight months after the fire, on October 12, 1995.  On that day, ATF Agent Daniel Boeh participated in a joint news conference with then Allegheny County District Attorney Robert Colville, asking people to come forward with information concerning the Bricelyn Street fire, and advertising the $15,000 reward.  Soon after that news conference, at 6:15 p.m., Wright walked into a fire station claiming to have information concerning the fire.

Ibrahim Abdullah, a then juvenile, who had known Appellee while attending a juvenile boot camp program for delinquents, also testified against Appellee.  Abdullah indicated in his trial testimony that Appellee had twice bragged to him about setting the fire.  Abdullah also denied having been promised anything for his trial testimony.  However, Abdullah admitted

at a PCRA hearing fifteen years later that he had expected to be paid out of the reward fund for his testimony.

Following a consolidated trial with his mother, Appellee was convicted of three counts of second degree murder, two counts of arson, and one count of insurance fraud. The court sentenced Appellee to three consecutive life sentences for the murders, and consecutive sentences of 5-10 years' incarceration and 2½-5 years' imprisonment on the arson counts. The court did not impose a sentence on his insurance fraud charge.

Appellee timely filed a post-sentence motion on May 1, 1997. Therein, he requested an evidentiary hearing related to a claim that ATF agents offered monetary payments to potential witnesses. He did so based on public information that ATF had offered a reward during the investigation of the case. Specifically, Appellee provided the court with a copy of a letter and reward notice sent to residents of Bricelyn Street offering a $15,000 reward for information leading to an arrest and conviction for the fire.[1]

The trial court declined to hold a hearing on the issue, finding that there was no evidence that any witness who testified received reward money. On direct appeal, this Court opined that "[b]ecause [Appellee] knew of the existence of the reward offers prior to trial, and [Appellee] had the

---

[1] In addition, during his trial, Appellee offered testimony by Raoul Gibson, who asserted that ATF Agent Jason Wick offered to pay him money in exchange for implicating Appellee.

- 4 -

opportunity to question witnesses at trial about whether any reward or other consideration had been offered to them in return for their testimony, we agree with the trial court that [Appellee] failed to establish any grounds that would necessitate a full evidentiary hearing." ***Commonwealth v. Gregory Brown, Jr.***, No. 02034 Pittsburgh 97, unpublished memorandum at 14 (Pa. Super. filed December 10, 1999). We also rejected Appellee's claims regarding the Commonwealth's failure to disclose flyers offering a reward. The panel concluded that these flyers were equally accessible to both parties and no discovery violation had occurred. Ultimately, we affirmed Appellee's sentence in part, vacated his sentence at one arson count, and the Pennsylvania Supreme Court subsequently denied his petition for allowance of appeal on September 12, 2000. ***See Commonwealth v. Gregory Brown, Jr.***, 750 A.2d 364 (Pa. Super. 1999) (unpublished memorandum), *appeal denied*, 761 A.2d 548 (Pa. 2000) (table).

Rather than seeking state post-conviction review via the PCRA, Appellee filed a federal *habeas corpus* petition on September 10, 2001. Therein Appellee claimed, among other issues not relevant here, that his due process rights were violated because the government financially induced testimony against him without disclosing that information. Additionally, Appellee's trial/*habeas* counsel filed a Freedom of Information Act ("FOIA") request with ATF seeking information regarding payment to witnesses. Appellee did not receive any information based on that request that indicated that witnesses were paid as part of a reward program.

The federal district court heard oral argument on December 6, 2002. The federal court queried the Commonwealth's attorney about whether payments were made to Keith Wright. The attorney indicated that he had reviewed ATF records, contacted both the assistant district attorney and assistant United States attorney who tried the case, and that he had not seen any record of a payment. Thereafter, the federal district court denied Appellee's request for an evidentiary hearing and his petition on January 15, 2004. The Third Circuit Court of Appeals denied his request for a certificate of appealability on August 6, 2004. Appellee then hired a private investigator to attempt to locate Mr. Wright, but the investigator was unable to find him.

In 2004, Appellee contacted the Innocence Institute at Point Park University (hereinafter "Innocence Institute" or "the Institute"). The Institute is an independent journalism project in which both graduate and undergraduate students investigate allegedly wrongful convictions. Initially, the Institute did not begin an investigation into Appellee's case. However, as part of its consideration of arson cases based on faulty expert scientific testimony, it began to closely look into the matter in 2009. Based on the Institute's findings, Appellee filed a *pro se* PCRA petition on May 5, 2010, alleging newly-discovered facts, premised on the expert opinion of Dr. Gerald Hurst regarding cause and origin of fire evidence. Since the original trial judge in this matter was no longer an Allegheny County Court of

Common Pleas judge, the matter was assigned to Judge Joseph Williams, III. The court thereafter appointed PCRA counsel for Appellee.

In addition, while pursuing the arson-evidence related matters, the Innocence Institute filed a FOIA request with ATF related to the payment of reward money. At this point, for the first time, ATF provided two canceled checks, with all identifying information redacted, showing that checks for $5,000 and $10,000 had been issued in August of 1998 in regard to the Bricelyn Street fire case. A subsequent request to ATF seeking unredacted copies of the checks was refused. The Innocence Institute also received copies of the same redacted checks from the Allegheny County District Attorney's Office after filing a Pennsylvania Right to Know request. This initiated further investigation by the Institute.

In an effort to locate Abdullah, members of the Innocence Institute traveled to Reading, Pennsylvania, where Abdullah had lived at the time of trial. Ultimately, they found a Protection from Abuse Order ("PFA") against Abdullah. The Institute contacted the woman who had requested the PFA, who resided in California at the time. She indicated that Abdullah's grandmother had a Facebook account. Accordingly, the Innocence Institute contacted his grandmother via Facebook and provided her with a telephone number for Abdullah to reach them. Abdullah did get in touch with the Institute, and students spoke to him on August 9, 2010. He stated that he did receive $5,000 from ATF Agent Wick after Appellee's trial. Importantly, he also indicated that he understood that he would receive that money at

the time he testified. Concomitantly, the Innocence Institute made efforts to find Wright. In doing so, they sent letters to multiple individuals in the Pittsburgh area named Keith Wright and knocked on doors looking for information that could lead to him. These initial efforts proved unsuccessful.

On August 12, 2010, the attorneys currently representing Appellee *pro bono*, entered their appearance. They filed Appellee's first amended PCRA petition on September 17, 2010. Therein, Appellee set forth that he had learned that ATF had, in fact, paid unidentified witnesses eighteen months after his trial. Appellee, through counsel, also filed FOIA requests with ATF in May of 2011. An additional request was filed on June 1, 2011. ATF provided redacted documents on July 11, July 27, August 5, and August 10, 2011. None of these materials revealed the names of the recipients of the reward money. In the meantime, counsel for Appellee located Wright. In December of 2011 and January of 2012, Wright acknowledged receiving $10,000 from ATF for his testimony. He also provided that, at the time of trial, he understood that he could receive reward money from ATF. ATF confirmed that Wright received this payment by providing documents identifying Wright on January 5, 2012.

Appellee filed a second amended PCRA petition on February 1, 2012, including Wright's admissions to receiving $10,000 for his testimony at trial and that he understood that he would receive the payment. The PCRA court conducted an evidentiary hearing on February 15, 2012, which was

continued until May 22, 2012. At the February hearing, Wright was the only witness to testify.

Wright confirmed that he was paid $10,000 after Appellee's trial by ATF. He acknowledged meeting with ATF Agent Wick before the trial, but could not recall whether Agent Wick told him about the reward. The Commonwealth stipulated that Wright testified before a grand jury on November 9, 1995, at a coroner's inquest on May 3, 1996, and at a preliminary hearing on June 14, 1996. Wright maintained that initially there was no discussion regarding money and that he did not have an expectation of payment. He did state that he did not know of the reward when he testified before the grand jury, but admitted that he became aware of the reward at some point, but that he was unsure of when. At one point, he appeared to indicate that he knew of the reward at either the coroner's inquest or the preliminary hearing. The Commonwealth repeatedly questioned Wright as to whether he learned of the possible reward after the trial. Wright was unclear as to the timing of when he was told of the reward, and testified that he had told police within the last week that he did not know that he would receive the money until after the trial. However, he also testified that his statement in his affidavit to PCRA counsel was accurate, wherein he declared that he knew of the reward before trial.

Counsel for Appellee continued to pursue other avenues of investigation to corroborate Abdullah's expectation of payment. As part of this undertaking, counsel interviewed two former Berks County probation

officers, Louis Topper and Stanley Cooper. These men corroborated that Abdullah was expecting to be paid reward money by ATF. Accordingly, Appellee submitted a third amended petition on May 4, 2012, within sixty days of the interviews. Additionally, Appellee discovered a Pittsburgh Bureau of Fire memorandum, which had not been disclosed by the Commonwealth prior to or during Appellee's trial. That memorandum discussed ATF's initial contact with Wright. According to the memo, Wright contacted law enforcement after watching a news story announcing a possible $15,000 reward. Again, Appellee filed a fourth amended petition, on May 9, 2012, including this information. The Commonwealth filed an answer on May 10, 2012, and Appellee submitted a fifth amended petition, asserting that trial counsel was ineffective in failing to adequately investigate the case. Appellee filed this petition one day before the PCRA court resumed conducting its evidentiary hearings. The Commonwealth responded to that filing on May 29, 2012. From May 22 through May 24, 2012, the PCRA court heard evidence.

The first witness to testify at the May 22, 2012 hearing was former Berks County probation officer Topper. Topper was Abdullah's probation officer during the time period when he was cooperating with ATF. He indicated that Agent Wick would frequently contact him about Abdullah's cooperating in the case against Appellee. Topper testified that there were discussions regarding money and that Abdullah knew there was a $15,000 reward. According to Topper, Agent Wick was very persistent in setting up a

meeting with Abdullah that occurred on February 28, 1996. Topper was present at the meeting. He provided that Agent Wick's questions suggested answers to Abdullah.

Topper was sure that Abdullah was aware of the reward offer and stood to gain from providing information. Indeed, he testified that "[t]he money issues w[ere] brought up pretty much every time [he] dealt with [Agent] Wick." N.T., 5/22/12 – 5/24/12, at 51. Specifically, Topper submitted that Agent Wick discussed the money with Topper between ten and twenty times. Topper relayed that Abdullah believed he would be able to pay off his juvenile delinquency costs and fines if he received the reward money.

Abdullah also testified. He related that Topper told him that ATF was interested in speaking with him about Appellee. According to Abdullah, Topper informed him that ATF was offering $15,000 for information leading to a conviction. He claimed that he knew of the reward money before meeting with Agent Wick. Abdullah admitted that the money was a highly motivating factor in his cooperation with ATF. He stated that Agent Wick told him before Appellee's trial that he would get $5,000, which is what he was paid. He explained that, at trial, he did not testify to any promises being made to him, because no one said, "I promise you this." *Id.* at 100. In addition, Abdullah provided that Agent Wick told him, "'I didn't promise you anything, so if they ask you if you was [sic] promised anything,' you know, he wasn't – 'I never said I promised you anything; right?' and I was,

like, Yeah." *Id.* at 100-01. Abdullah concluded his direct testimony by testifying that he had an expectation of getting paid, and that Agent Wick provided that expectation. Nevertheless, on cross-examination, Abdullah maintained that his testimony at Appellee's trial, concerning Appellee's admissions regarding the fire, was truthful.

Former Berks County probation officer Cooper, another of Abdullah's probation officers, confirmed Topper's testimony that Abdullah expected to be the recipient of reward money. He added that Abdullah was very excited about the possibility of receiving the money because it could help his family. At one point, Cooper testified that Abdullah was "giddy" about potentially getting reward money. *Id.* at 194.

Abdullah's former girlfriend, and the woman who had obtained a PFA order against him, testified on May 23, 2014. She confirmed that Abdullah knew that he would receive money. She also testified that Agent Wick and Abdullah were in frequent contact, and that Abdullah claimed to have received other money from Agent Wick, aside from the ATF reward.

William Moushey, Jr., an investigative journalist, and the director of the Innocence Institute, testified next. He indicated that Appellee first contacted the Institute eight years earlier, which would have been in 2004. He testified that the Innocence Institute worked on the case for a while, but "then it sat idle for a while." *Id.* at 251. Nonetheless, the Innocence Institute continued to examine the case, and in 2009 it began a comprehensive investigation. Director Moushey and his team pursued FOIA

requests and discovered that two witnesses were, in fact, paid a reward. According to him, they learned that one witness had received payment before the FOIA request. However, the Institute did not learn the identities of those individuals at that stage. He remarked that he and a graduate assistant student traveled to Berks County to try and locate Abdullah and that the graduate student actually went back and forth three or four times. This investigation led them to contact Abdullah's former girlfriend, Abdullah's grandmother, and ultimately Abdullah himself. Director Moushey also relayed the Innocence Institute's efforts in locating Wright. Director Moushey also commented on a letter he received from a first Assistant U.S. Attorney (AUSA), dated August 25, 2010, wherein the attorney explicitly stated that neither Agent Wick, nor the prosecuting attorneys, discussed rewards before or during trial.

Appellee's trial attorney, Alexander Lindsay, was also called to testify at the May 23, 2012 hearing. He related that the Commonwealth never disclosed that any witnesses had an expectation that they might be paid a reward following an arrest or conviction. The Commonwealth also failed to disclose the existence of any documents indicating that a reward had been offered. Attorney Lindsay submitted that he only became aware of a reward offer after he had delivered his closing argument to the jury, when Appellee's mother provided to him the letter that had been sent to residents of Bricelyn Street offering the $15,000 reward.

Attorney Lindsay recounted that the reward offer had been somewhat of a surprise to him, even though during the testimony of Raoul Gibson, Attorney Lindsay had elicited testimony that Agent Wick had offered Gibson $7,000 to testify favorably for the prosecution against Appellee. However, Attorney Lindsay stated, "[t]he reaction … to the fact that there may have been some money offered to the witness was shock on the part of the prosecutor, in my mind, that we would even suggest such a thing." *Id.* at 290-91. Attorney Lindsay indicated that, during a vigorous cross-examination of Gibson, AUSA Shaun Sweeney sarcastically asked, "You think there's some type of fund that we can get money to pay witnesses?" *Id.* at 291.[2]

Following the conclusion of the hearings, the PCRA court directed the parties to file memoranda of law in support of their various positions. On June 25, 2012, the PCRA court found Appellee's ineffectiveness claim in his fifth amended petition to be waived. It did not address the remaining issues at that time. Subsequently, on August 22, 2012, Appellee filed an additional amended petition raising a claim that his sentence was unconstitutional pursuant to *Miller v. Alabama*, 132 S.Ct. 2455 (2012) (holding

---

[2] Our review of the original trial transcript indicates that Attorney Lindsay's recollection was reasonably accurate with regard to U.S. Attorney Sweeney's cross-examination of Gibson. U.S. Attorney Sweeney's precise question was, "You think there is a fund somewhere with $7,000 that agents can just go grab and pay you?" N.T., 2/12/97 – 2/14/97, at 732.

unconstitutional the mandatory imposition of life-without-the-possibility-of-parole sentences on juvenile defendants). Both parties then provided the PCRA court with their respective post-hearing memorandum. Appellee filed responsive and supplemental briefs. On February 19, 2014, the PCRA court granted Appellee a new trial, finding that his claims relative to the non-disclosure of Wright's and Abdullah's expecting reward money satisfied exceptions to the PCRA's time-bar, and that the result of the proceeding would likely have been different had this information been disclosed. The Commonwealth timely appealed that same day. The PCRA court directed the Commonwealth to file and serve a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The Commonwealth complied. This matter is now ready for this Court's review.

The Commonwealth presents three issues for our consideration:

I.      Whether the PCRA court erred in granting Appellee post-conviction relief in the form of a new trial where the PCRA petition was untimely filed?

II.      Whether the PCRA court erred in granting Appellee post-conviction relief in the form of a new trial on his **Brady**[3] violation claim?

III.      Whether the PCRA court erred in granting Appellee post-conviction relief in the form of a new trial on his prosecutorial misconduct claim?

---

[3] **Brady v. Maryland**, 373 U.S. 83 (1963). In **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady**, 373 U.S. at 87.

Commonwealth's Brief at 4.

In conducting review of a PCRA matter, we consider the record "in the light most favorable to the prevailing party at the PCRA level." ***Commonwealth v. Henkel***, 90 A.3d 16, 20 (Pa.Super. 2014) (*en banc*). Our review is limited to the evidence of record and the factual findings of the PCRA court. ***Id.*** This Court will afford "great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record." ***Id.*** Thus, when a PCRA court's ruling is free of legal error and is supported by record evidence, we will not disturb its decision. ***Id.*** Of course, if the issue pertains to a question of law, "our standard of review is de novo and our scope of review is plenary." ***Id.*** Since Appellee was successful below, we view the factual findings and credibility determinations in a light most favorable to him, so long as the record supports those conclusions. ***See Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*).

### The Timeliness of Appellee's PCRA Petition

The Commonwealth's first claim alleges that Appellee's PCRA petition was untimely and, thus, the PCRA court lacked jurisdiction to entertain it. Indeed, this claim implicates our own jurisdiction as well. ***See Commonwealth v. Robinson***, 837 A.2d 1157, 1163 (Pa. 2003) (holding that where the "petition at issue … was untimely and did not fall within any of the three exceptions to the time-bar, both the PCRA court and the Superior Court lacked jurisdiction").

In order for a post-conviction petition to be timely under the PCRA, it must be filed within one year of the finality of the petitioner's judgment of sentence. 42 Pa.C.S. § 9545(b)(1). Appellee's judgment of sentence became final for PCRA purposes on December 11, 2000, 90 days after our Supreme Court denied his petition for review. Appellee filed his original underlying petition at issue in this appeal in May of 2010, which was facially untimely.

However, Appellee alleged the applicability of multiple timeliness exceptions in his initial, *pro se* PCRA petition. Specifically, he maintained that his "failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States." 42 Pa.C.S. § 9545(b)(1)(i). He also claimed that his petition was based on newly-discovered facts that were "unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). These exceptions are additionally constrained by the fact that "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

The newly-discovered fact timeliness exception requires a three-fold inquiry. First, the information upon which the claim is based must have been unknown. **Commonwealth v. Bennett**, 930 A.2d 1264, 1272 (Pa. 2007); 42 Pa.C.S. § 9545(b)(1)(ii). Second, the fact or facts could not have

- 17 -

been learned by the exercise of due diligence. *Id.* In addition, the petitioner must have filed his petition within sixty days of learning of the fact. 42 Pa.C.S. § 9545(b)(2). We do not conduct a merits analysis of the underlying claim in deciding if it is timely. *Commonwealth v. Lambert*, 884 A.2d 848, 852 (Pa. 2005); *Commonwealth v. Stokes*, 959 A.2d 306, 310 (Pa. 2008) (determination of timeliness is distinct from analyzing merits of a *Brady* claim).

The governmental interference exception requires a similar inquiry. To establish that exception, "the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence." *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008).

The PCRA court held that Appellee's "allegations satisfy the pleading requirements regarding timeliness." PCRA Court Opinion (PCO), 2/19/14, at 14. Although the PCRA court appears to have based Appellee's satisfaction of the timeliness requirements of the PCRA on the newly-discovered evidence exception, a careful reading of the PCRA court's opinion demonstrates that the facts supporting its determination were equally applicable to the governmental interference exception. Under either exception, the critical inquiry in this case is whether Appellee could have successfully raised his claim at an earlier time through the exercise of due diligence.

The Commonwealth maintains that Appellee "did not present any facts in his petition that could not have been ascertained earlier by exercising due diligence." Commonwealth's Brief at 42. The Commonwealth reasons that due diligence is not established by "blaming the Commonwealth for failing 'to provide the exculpatory facts.'" *Id.* at 43. It points out that the ATF reward was publicly announced on October 12, 1995. The Commonwealth also suggests that, as demonstrated by Appellee's post-trial, direct appeal, and federal *habeas* filings, he knew since the end of his trial that "witnesses might have been paid from the reward fund and/or induced to testify by promises of receiving monetary payments." *Id.* at 44.

In the Commonwealth's view, "[t]he PCRA afforded [Appellee] the ability to expand the record by requesting discovery and it offered the possibility of an evidentiary hearing." Commonwealth's Brief at 47. It adds that "Appellee could have filed a FOIA request at any point after his conviction[,]" but "waited until February 13, 2004 to make a FOIA request to the ATF." *Id.* The Commonwealth continues by attacking prior counsel's strategy in attempting to uncover the pertinent information. Specifically, it quotes trial counsel's PCRA hearing testimony that he did not file a PCRA petition and did not submit a FOIA request until March of 2004. Trial counsel admitted that he could have pursued both options but also noted, in response to cross-examination by the Commonwealth's attorney, "I was in a courtroom with you, sir. And I thought you knew the answer, and I was not able to get it in that [federal] hearing." N.T., 5/22/12 – 5/24/12, at 339.

The Commonwealth recognizes that Appellee contacted the Innocence Institute at some point, but no action was taken until that organization filed a FOIA request with the ATF in November of 2009. It acknowledges that from this point forward, Appellee uncovered that Wright and Abdullah were in fact paid. Specifically, it recognizes that Appellee, through various FOIA requests, was able to discover that Wright was paid $10,000 and Abdullah $5,000. However, it recites these facts not to demonstrate that Appellee exercised due diligence, but to show that had he filed FOIA requests earlier, "he could have discovered the names of the witnesses and interviewed them." Commonwealth's Brief at 51.

In support of its position that Appellee did not exercise due diligence, the Commonwealth relies on **Commonwealth v. Monaco**, 996 A.2d 1076 (Pa. Super. 2010), **Commonwealth v. Taylor**, 933 A.2d 1035 (Pa. Super. 2007), and **Commonwealth v. Hawkins**, 953 A.2d 1248 (Pa. 2008). In **Monaco**, the defendant pled guilty in 1979 to homicide. The court conducted hearings on his degree of guilt and determined that he was guilty of first degree murder. He filed his first post-conviction petition in 1986, under the Post-Conviction Hearing Act. This resulted in the reinstatement of the defendant's right to file a petition for allowance of appeal. The Pennsylvania Supreme Court denied allocatur in 1989.

Monaco did not seek PCRA relief until 1997. The PCRA court denied relief, this Court affirmed, and our Supreme Court denied allowance of appeal. Monaco renewed his efforts in 2003, but was unsuccessful at the

PCRA level and withdrew his appeal to this Court. In June of 2007, he filed the petition underlying the **Monaco** Court's decision. Therein, he alleged that his own Post-Traumatic Stress Disorder ("PTSD") was a newly-discovered fact. Monaco, a Vietnam War veteran, received a December 1, 2006 report from a Veterans Administration ("VA") psychiatrist in May of 2007 that diagnosed him with a mild form of PTSD. Within sixty days of receiving that report, Monaco filed his petition. In rejecting Monaco's claim, this Court opined:

> Analyzing [Monaco's] efforts under the "due diligence" standard, we observe [Monaco] first suspected he suffered from PTSD in 2002 or 2003. [Monaco's] suspicions were sufficient to motivate him to contact Mr. Susengill and pursue VA disability benefits. Nonetheless, [Monaco] took no other steps to verify he had PTSD, outside the VA benefits application process. During this time, [Monaco] was also pursuing his 2003 PCRA petition. [Monaco], however, simply waited for the VA psychiatric evaluation and decision, then allowed his VA appeal to lapse, and only later petitioned to reopen his VA claim. [Monaco] failed to explain his lack of action or, alternatively, why he could not or did not obtain another evaluation to establish a definite diagnosis of PTSD at an earlier date. Therefore, we conclude [Monaco] failed to demonstrate he exercised due diligence in ascertaining the asserted "newly discovered" fact of his PTSD.

**Monaco**, 996 A.2d at 1082 (citation omitted).

In **Taylor**, **supra**, a jury found the defendant guilty of third degree murder, robbery, and conspiracy to commit robbery. The court sentenced the defendant on November 18, 1996. This Court affirmed and the Pennsylvania Supreme Court denied allowance of appeal on August 30, 1999. Taylor did not file a PCRA petition until April 27, 2005. The PCRA

court appointed counsel and permitted counsel to withdraw under the appropriate procedures. On appeal, Taylor alleged that he recently discovered that a coroner signed his arrest warrant and argued that the coroner had no such authority and that, consequently, the Court of Common Pleas had lacked jurisdiction to try him. The *Taylor* Court noted that coroners are authorized as an issuing authority in cases of violent or suspicious deaths. It then held that the warrant was a matter of public record and accessible to Taylor in 1995. Accordingly, Taylor's newly-discovered fact claim was without merit.

*Hawkins*, *supra*, was a plurality opinion. Therein, Hawkins was originally tried and convicted of first degree murder in 1990. However, he secured a new trial, but was again found guilty. At his second trial, a jailhouse witness, Malcom Tucker, who had testified against Hawkins in the first trial was deceased. His testimony, indicating that Hawkins admitted to the killing, was read to the jury. During Hawkins' first trial, Tucker was awaiting trial for a sexual assault case.

Hawkins was unsuccessful in his first PCRA proceeding. He then sought federal *habeas* relief. During those proceedings, it was revealed that the prosecutor in both of Hawkins' trials had testified at Tucker's 1991 sentencing hearing in the sexual assault case. Specifically, the prosecutor set forth that, in exchange for Tucker's testimony, he had promised that they would relay Tucker's cooperation to the sentencing court. This information was not disclosed to Hawkins. However, Tucker did testify at

the first trial that he was hoping that his cooperation would be considered favorably in his own case. Hawkins filed a serial PCRA petition based on his discovery of the pre-existing agreement. The **Hawkins** plurality ruled that the defendant's petition was untimely because the information was available in 1990 and 1991, noting that the prosecutor's statements at Tucker's sentencing were a matter of public record.

Based on these cases, the Commonwealth contends that, since Appellee knew of the possibility that witnesses were paid at the time of trial, the facts upon which his claim is predicated were not unknown and he did not exercise due diligence in learning that Wright and Abdullah expected to receive payment for coming forward. Appellee responds that there is an abundance of record support for the PCRA court's findings that he was duly diligent. In this respect, he highlights that ATF Agent Wick instructed a Commonwealth witness to falsely deny that he had been promised anything in exchange for his testimony. Appellee also notes that in multiple proceedings after his trial, the Commonwealth continued to assert that there was no evidence witnesses were paid. Further, relying on federal court precedent, Appellee suggests that our due diligence analysis "'should take into account that prisoners are limited by their physical confinement.'" Appellee's Brief at 29 (quoting **Moore v. Knight**, 368 F.3d 936, 940 (7th Cir. 2004), and citing **Wilson v. Beard**, 426 F.3d 653, 660-661 (3d Cir. 2005)).

Appellee also counters the Commonwealth's argument relative to his use of FOIA requests, and his decision not to initially file a PCRA petition. In leveling this aspect of his position, he posits that the Commonwealth misrepresents the factual predicate of his claim. Appellee asserts that the basis of his petition is not the fact that a reward existed or that two witnesses were actually paid. Rather, he contends that the facts predicating his **Brady**/**Napue**[4]/**Giglio**[5]-based (hereinafter "**Brady**-based") claims are that these two witnesses had the knowledge, understanding, and expectation that they would be paid after coming forward and testifying based on promises made by Agent Wick. Accordingly, Appellee submits that these facts were not discovered via the FOIA requests or discovery, "but through exhaustive investigation by two agencies and multiple trained lawyers." Appellee's Brief at 33.

Appellee points out that the ATF file did not confirm that the witnesses expected or understood that they would get paid. Instead, the ATF records

---

[4] **Napue v. Illinois**, 360 U.S. 264 (1959). In **Napue**, the Supreme Court of the United States held that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend." **Napue**, 360 U.S. at 269.

[5] **United States v. Giglio**, 405 U.S. 150 (1972). In **Giglio**, the Supreme Court of the United States held that "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility." **Commonwealth v. Strong**, 761 A.2d 1167, 1171 (Pa. 2000) (citing **Giglio**, 405 U.S. at 154).

disclosed through the FOIA requests merely noted that witnesses had been paid. Those documents were also redacted and did not include the names of the witnesses that received payment. While Appellee did use the FOIA information, he still had to locate Wright and Abdullah to determine if they testified in expectation of payment after the trial.

Appellee also contends that seeking discovery by filing an earlier PCRA petition does not demonstrate a lack of diligence. He notes that in non-capital PCRA proceedings, discovery is only permitted "with a showing of exceptional circumstances." 42 Pa.C.S. § 9545(d)(2). In light of the fact that in the federal *habeas* proceedings, the Commonwealth continued to maintain that there was no evidence that any payments had been made, Appellee argues that he could not have demonstrated such circumstances. Appellee adds that Agent Wick never informed the prosecutors in this matter that the witnesses did expect to receive reward money.

We begin our analysis by determining what "facts" were necessary for Appellee to set forth a successful claim under the newly-discovered evidence or governmental interference exceptions. In this regard, we agree with Appellee that the relevant "facts" discovered after his trial that were necessary to invoke either exception were not that a reward was offered by the ATF, which was public information, or that two witnesses were paid eighteen months after his trial. The mere fact that an award had been offered would have been irrelevant unless Wright and Abdullah, at a minimum, were aware of the offer. Indeed, the failure to disclose such

information to Appellee could only have been prejudicial had the witnesses testified in anticipation of receiving a reward. Moreover, disclosure that an award had been paid, information that, the Commonwealth argues, was available to Appellee in 1998, is also not a fact upon which Appellee could base a cognizable claim. Even had such a disclosure not been redacted, and instead specifically identified Wright and Abdullah as recipients, the rewards were not paid out until years after Appellee's trial. Consequently, Appellee could not have based a claim for relief premised upon the failure of the Commonwealth to disclose evidence at trial where the evidence in question did not even exist until years after the trial. Thus, we must reject the Commonwealth's assertion that the "new fact" underlying Appellee's **Brady**-based claims was information contained in a FOIA disclosure that rewards had been paid, or information that a reward had been offered to the public.

There is no dispute that the Commonwealth did not turn over information regarding discussions with the witnesses that they could be paid from a reward fund or that the witnesses expected to be paid. Furthermore, during the grand jury investigation, Wright denied coming forward after learning of a potential reward. At trial, Wright also testified that there had not been any discussion with law enforcement about a possible reward. Similarly, Abdullah testified at trial that no one in law enforcement made any promises to him regarding his testimony. He also buttressed that testimony by saying that he was testifying because it was the right thing to do. Thus, the key facts denied to Appellee at the time of trial, but discovered at a later

time, were that Wright and Abdullah had testified in anticipation of receiving a reward.

Accordingly, we proceed to examine whether Appellee exercised due diligence. Black's Law Dictionary defines "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." Black's Law Dictionary 488 (8th ed. 2004). It is well-established that due diligence requires that a "petitioner take *reasonable* steps to protect his own interests." **Commonwealth v. Medina**, 92 A.3d 1210, 1216 (Pa. Super. 2014) (*en banc*) (emphasis added). This Court has defined due diligence outside the PCRA context, for purposes of the Commonwealth's complying with our rules of criminal procedure pertaining to speedy trials. That definition provides that "[d]ue diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing … that a reasonable effort has been put forth." **Commonwealth v. Jones**, 886 A.2d 689, 700 (Pa. Super. 2005) (quoting **Commonwealth v. Hunt**, 858 A.2d 1234, 1241-42 (Pa. Super. 2004)). We have recently utilized that definition in analyzing a PCRA case. **Commonwealth v. Davis**, 86 A.3d 883, 891 (Pa. Super. 2014). Thus, in sum, due diligence is established when, in the factual context of a given case, reasonable efforts are made.

The record supports the PCRA court's conclusion that Appellee's efforts in this case were more than reasonable. Appellee first attempted to have an

evidentiary hearing at the conclusion of his trial to learn if any witnesses were offered or expected a reward in exchange for their testimony. After being denied an evidentiary hearing, he continued to pursue that claim on direct appeal. He also sought this information in his federal *habeas* proceeding, which extended until 2004. During these proceedings, the Commonwealth never revealed that Wright and Abdullah had been paid from the ATF reward fund in 1998. In fact, in 2002, the Commonwealth specifically stated in federal court that it could not find any evidence of rewards being paid in this case, despite the fact that it is now known that the rewards had been paid to Wright and Abdullah four years earlier.

Thereafter, Appellee sought the aid of the Innocence Institute. That organization initially investigated Appellee's case under the auspices of whether Appellee's conviction had been called into question by considerable upheaval in the realm of combustion science that had occurred since the time the Bricelyn Street fire had been investigated. When Appellee and the Institute discovered rewards had been paid through the FOIA request made in late 2009, the Innocence Institute then undertook a lengthy and determined effort to uncover the fact that Wright and Abdullah were the witnesses paid a reward based on their testimony, and that they had known of and anticipated receiving the reward when they testified at Appellee's trial. The initial discovery made through the Institute's first FOIA request did lead to further discoveries regarding Wright's and Abdullah's expectations, once those witnesses were finally located. It also led to

further discoveries regarding Agent Wick's actions in this case when the Innocence Institute sought corroborative evidence of Abdullah's expectations from his probation officers who were present when Abdullah was interviewed on multiple occasions by Wick. Furthermore, it was only after these investigations revealed the witnesses' expectations during trial, and that they had been subsequently paid out of the reward fund, that the ATF relented and provided unredacted reports identifying Wright and Abdullah as recipients of the $10,000 and $5,000 rewards, respectively.

Although the discovery that a reward had been paid in the face of the Commonwealth's denials was the impetus for further investigation, it was not, as discussed above, a fact sufficient to establish that due process violations had occurred. The first fact that directly supported Appellee's due process claims was revealed by the initial contact with Abdullah, an event that revealed Abdullah's expectations at the time of trial. The Commonwealth does not dispute that Appellee promptly and repeatedly amended his PCRA petition as facts regarding Wright, Abdullah, and Agent Wick surfaced.

Based upon these facts, the PCRA court determined that Appellee had exercised due diligence. Stated another way, the PCRA court found that Appellee's previous failure to discover that Wright and Abdullah had testified in anticipation of receiving a reward was not because of a lack of due diligence. Given our standard of review, we cannot accept the Commonwealth's assertion to the contrary, because "[w]e must accord great

deference to the findings of the PCRA court, and such findings will not be disturbed unless they have no support in the record." ***Commonwealth v. Scassera***, 965 A.2d 247, 249 (Pa. Super. 2009).

There is ample support in the record for the PCRA court's due diligence determination. While it is evident that Appellee had a suspicion early on that the offer of a reward may have played a role in this case, there is factual support in the record for the PCRA court's determination that reasonable and appropriate efforts to explore the matter were made. Appellee requested a hearing before the trial court, repeatedly requested related discovery from the Commonwealth, and was thwarted by the Commonwealth's repeated denials that a reward had even been paid. Appellee's belief that a reward had been anticipated by Wright and Abdullah, however strongly held, amounted to no more than a mere suspicion, which only evolved into a colorable claim when the Innocence Institute unveiled those expectations.

The Commonwealth also contends that the additional facts underlying Appellee's claims could have been discovered had Appellee filed a timely PCRA petition. We disagree. It was extremely unlikely that Appellee would have been entitled to PCRA discovery, or even a PCRA hearing, armed only with a suspicion that the government was hiding information that a reward had been offered and that witnesses had lied about it. As our Supreme Court has declared, "PCRA hearings are not discovery expeditions; rather, they are conducted when necessary to offer the petitioner an opportunity to prove that which he already has asserted, and only when his proffer

establishes a colorable claim about which there remains a material issue of fact." **Commonwealth v. Sneed**, 45 A.3d 1096, 1107 (Pa. 2012).

Moreover, our review of due diligence is focused on whether what was done was reasonable, not on what was not done. For instance, in the context of whether the state has acted with due diligence in locating a defendant, this Court has stated:

> [A]lthough the police could have pursued other avenues to locate [the defendant], that is not the controlling factor. It is simply not required that the Commonwealth exhaust every conceivable method of locating a defendant. Rather, when reasonable steps are taken, the requirement of due diligence is met.

**Commonwealth v. Hinton**, 409 A.2d 54, 57 (Pa. Super. 1979); *accord* **Commonwealth v. Faison**, 471 A.2d 902, 903 (Pa. Super. 1984) (quoting **Hinton**); **Commonwealth v. Cruz**, 524 A.2d 507, 509 (Pa. Super. 1987) ("The actions must be judged by what was done, not by what was not done. In addition, the efforts need only be reasonable and lack of due diligence should not be found simply because other options were available or in hindsight would have been more productive.").

Similarly, here, it is of little value that with 20/20 hindsight, the Commonwealth can offer alternative means by which Appellee could have discovered Wright's and Abdullah's internal thought processes. Our analysis must instead be centered on whether Appellee acted with due diligence, not on whether he could have been more diligent. We find ample support in the record that the steps taken by Appellee were reasonable in the

- 31 -

circumstances presented, even though it may be true that efforts that go above what due diligence requires could have obtained more fruitful results (such as the efforts undertaken by the Innocence Institute in this case). "It is an appellant's burden to persuade us the PCRA court erred and relief is due." **Commonwealth v. Coon**, 26 A.3d 1159, 1161 (Pa. Super. 2011). Moreover, "we grant great deference to the factual findings of the PCRA court and will not disturb those findings *unless they have no support in the record*." **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012) (emphasis added).

Finally, we note that the Commonwealth does not dispute that Appellee amended his PCRA petition within 60 days of learning these new facts. Accordingly, the PCRA court did not err when it determined that Appellee's PCRA petition was timely under the newly-discovered fact timeliness exception to the PCRA's jurisdictional time-bar. 42 Pa.C.S. § 9545(b)(1)(ii).[6]

_____

[6] The Dissent disputes that there is a distinction between the offer of a reward, which was arguably public knowledge at the time of Appellee's trial, and evidence of the witnesses' anticipation of receiving a reward based on promises made by Agent Wick, which was not public knowledge. **See** Dissenting Memorandum, at 1-2. Notably, in reaching this conclusion, the Dissent relies on the factual record as it stood at the time of Appellee's direct appeal, when the *only* evidence that the witnesses in question had testified in anticipation of receiving a reward was the existence of the reward offer. Thus, the Dissent appears to reject, without explanation, the factual findings of the PCRA court that establish that Appellee did not have the factual basis upon which to base his current claims until the Innocence

*(Footnote Continued Next Page)*

Because the PCRA court found the newly-discovered fact exception applicable to Appellee's *Brady*-based claims, it did not reach the question of whether the governmental interference exception applies. Although we conclude that the newly-discovered fact exception applied, it appears that the governmental interference exception is *at least* equally applicable in this instance, due to the PCRA court's fact and credibility determinations regarding Agent Wick's actions before, during, and after Appellee's trial. Indeed, based upon the PCRA court's findings, we conclude that the governmental interference exception to the PCRA's jurisdictional time-bar also applies to excuse Appellee's otherwise untimely petition. In this regard, we note that "[t]his Court may affirm a PCRA court's decision on any grounds if the record supports it." *Ford*, 44 A.3d at 1194.

*(Footnote Continued)* ─────────────────

Project uncovered that the witnesses in question had obfuscated the fact that Agent Wick had made promises to them regarding that reward.

We also note that the Dissent fails to address, or simply commingles, Appellee's reliance on the newly-discovered evidence exception with his reliance on the governmental interference exception. The Dissent does not describe how knowledge of a reward offer, alone, could reasonably lead, through the exercise of due diligence, to the discovery of Agent Wick's actions and omissions which gave rise to Appellee's reliance on the governmental interference exception for his substantive prosecutorial misconduct and *Brady*-based claims. Both Wright and Abdullah denied having been promised anything by the Commonwealth for their testimony at Appellee's trial. Moreover, the issues at hand concern not merely some after-discovered impeachment evidence but, instead, new evidence of *Brady* violations and prosecutorial misconduct not provided by the reward offer itself.

Regarding Wright's belief that he would be rewarded for testifying against Appellee, the PCRA court found that, despite Agent Wick's denials, Agent Wick had discussed a reward with Wright prior to Wright's testifying at Appellee's trial and, distressingly, that "[t]hose discussions were purposefully not disclosed by [Agent] Wick to the prosecution's legal team." PCO, at 19. Regarding Abdullah's belief that he would be rewarded for testifying against Appellee, Appellee's former probation officer, Topper, testified as to his recollection of Agent Wick's pursuit of Abdullah as a witness against Appellee. Topper indicated that he and Agent Wick had repeatedly discussed the possibility of Abdullah being rewarded for his testimony. Initially, "Abdullah wasn't interested [in testifying] because he was close to his release date and didn't want to get involved." *Id.* at 24. However, after significant effort by Agent Wick, Abdullah eventually relented and agreed to testify. The PCRA court states that it largely found Agent Wick's testimony to the contrary to be incredible. *Id.* at n.21.

Abdullah testified at the PCRA hearing and "told [the PCRA] [c]ourt that he had an expectation of payment for his trial testimony." PCO, at 25. At trial, Abdullah denied having been promised anything for his testimony. At the PCRA hearing, he attributed this inconsistency to Agent Wick's actions. Just prior to trial, Agent Wick had coached Abdullah regarding any potential questions about Abdullah's financial interest in testifying against Appellee. Agent Wick encouraged Abdullah to respond that he had not been

promised anything for his testimony, despite extensive discussions the two had regarding the potential for a reward.

The PCRA court indicated that Abdullah's PCRA hearing testimony was corroborated by Topper's testimony, discussed above, as well as by that of another of Abdullah's probation officers, Cooper, and by Adrian Duson, Abdullah's romantic interest for several years after Appellee's trial. Cooper testified that soon after Appellee's trial, Abdullah's "overall demeanor was 'giddy' when the reward was discussed." PCO, at 25. Duson recalled Abdullah's making plans with the reward money he expected to receive for his testimony, and that Abdullah was essentially harassing Agent Wick for the reward until it was ultimately paid in 1998.

The PCRA court found that the Commonwealth's legal team was likely unaware of Agent Wick's discussions with Wright and Abdullah, at least in regard to the topic of a reward. However, as the court vividly explains:

> The prosecution team is not a 1 or 2 man band. It is a full blown orchestra. A critical member of the prosecution ensemble was the lead investigator from ATF, [Agent] Wick. He was the prosecutor's right hand man. He was the case agent. His presence was noted during the entire trial. … Not once[] did he inform either prosecutor that Wright and Abdullah were not entirely accurate with their testimony. Stated differently, [Agent] Wick did not tell either prosecutor that promises were made to them about getting paid from a reward fund. [Agent] Wick had a duty to let the prosecutor know those facts. He did not.
>
> …
>
> The Court views the conduct of [Agent] Wick in not telling either prosecutor of what really transpired with witness[es] Wright and

Abdullah as if the prosecutors themselves engaged in the same silence.

PCO, at 28-29.

Based upon the above findings of the PCRA court, which are supported by the record, we have no difficulty in concluding that Appellee successfully proved the applicability of the governmental interference exception to the PCRA's jurisdictional time-bar. Due to Agent Wick's nonfeasance, the Commonwealth repeatedly denied the existence of a reward and, relatedly, Wright and Abdullah's expectation thereof, until facts uncovered by the Innocence Institute demonstrated otherwise. Thus, the Commonwealth's claim that the PCRA court erred in determining that Appellee met an exception to the PCRA's jurisdictional time-bar requirement fails on two fronts, as both the newly-discovered facts and government interference exceptions applied to Appellee's *Brady* -based PCRA claims.

We are not at all dissuaded in this conclusion by the Commonwealth's citation of *Monaco*, *Taylor*, and *Hawkins*. *Monaco*, at first glance, may appear analogous to this case, but upon closer examination it is distinguishable and clearly not controlling. In *Monaco*, the petitioner had filed for benefits with the VA for his PTSD while he had a timely PCRA petition pending, yet took no action to amend his petition at that time. While there may be some minor comparisons to be made here, in that Appellee had an early suspicion of witnesses' testifying in anticipation of a reward, the similarities end there. Monaco's PTSD diagnosis was not alleged multiple times on prior occasions, only to be thwarted by Commonwealth

denials and interference, as was encountered by Appellee in this case. Moreover, Monaco's PTSD diagnosis was a condition affecting him directly and, thus, its discovery was almost exclusively within his control. By contrast, the newly-discovered facts in this case were the expectations of the Commonwealth's witnesses, which are not facts to which Appellee had direct access.

*Taylor* provides even less guidance. The newly-discovered fact in that case was directly accessible to Taylor at the time of his trial, being that the fact at issue was documented in a warrant for his arrest. Here, we have rejected the Commonwealth's assertion that the information obtained directly from a FOIA request, *i.e.*, that witnesses were paid a reward in this case, was the newly-discovered fact at issue. Moreover, the information contained in the response to Appellee's initial FOIA request was redacted, unlike the warrant in *Taylor*, where the fact at issue was apparent on the face of the public record at issue. Thus, all comparisons to *Taylor* must fail.

The *Hawkins* decision was a plurality decision and, thus, it has limited precedential value for this Court. *See Commonwealth v. Cooper*, 710 A.2d 76, 79 (Pa. Super. 1998) (finding that plurality opinions are not binding precedent). Nevertheless, the newly-discovered facts at issue in that case were the prosecutor's statements at a hearing that was contained in a public record. As with our analysis of *Taylor*, *Hawkins* is only relevant to this matter if the newly-discovered evidence at issue in this case was contained in the FOIA response by the ATF. However, not only did that document not

reveal that Wright and Abdullah had been paid (because their names had been redacted) but we have determined that even if an unredacted version had been provided, that document did not contain the newly-discovered facts at issue, which were the expectations of Wright and Abdullah that they would be rewarded.

Finally, we also find factual support in the record for the applicability of the newly-discovered evidence and/or governmental interference exceptions to the PCRA's time-bar regarding Appellee's prosecutorial misconduct claims. Notably, the Commonwealth fails to assert any argument regarding whether Agent Wick's failure to correct misleading testimony could have been discovered earlier by Appellee through the exercise of due diligence. Nevertheless, we conclude that Agent Wick's nonfeasance could not have been uncovered by Appellee until Abdullah and his former probation officers were interviewed by the Innocence Institute. Thus, for the same reasons that pertain to Appellee's *Brady*-based claims, both the newly-discovered evidence and/or governmental interference exceptions to the PCRA's time-bar apply to this claim as well.

## Brady Claim

In the Commonwealth's second issue, it claims that the PCRA court erred by granting Appellee a new trial based on the merits of his *Brady*-based claims. The Commonwealth's argument in this regard is two-fold: first, it alleges that the PCRA court made improper factual conclusions regarding the non-disclosure of impeachment information related to Wright;

and second, the Commonwealth contends that the non-disclosed impeachment evidence was not material and, therefore, that its omission could not have resulted in prejudice to Appellee.

Regarding the Commonwealth's first contention, it alleges that the record does not support the PCRA court's conclusions that: "(1) the Commonwealth failed to disclose Wright came forward the day of the press conference announcing the ATF Reward Fund; and (2) Agent Wick promised Wright money in exchange for his testimony and he expected to receive money." Commonwealth's Brief at 56-57. The Commonwealth reminds us that "if a PCRA court's factual finding lacks support in the record, it is not binding." *Id.* at 57 (citing **Commonwealth v. Iannaccio**, 450 A.2d 694, 698 (Pa. Super. 1982), *affirmed*, 480 A.2d 966 (Pa. 1984)).

With regard to the first 'disputed' fact, we agree with the Commonwealth that there is at least some evidence that Appellee and/or his trial counsel knew that Wright came forward with his information concerning the Bricelyn Street fire on the same day that a press conference announcing the ATF reward fund was held. However, the Commonwealth fails to cite to the portion of the PCRA court's opinion where the court found that the Commonwealth failed to disclose this information. Nor does the Commonwealth cite to the portion of the PCRA court's opinion which utilizes that fact as the basis of a legal conclusion. Indeed, the PCRA court's **Brady** analysis is instead centered on facts concerning the Commonwealth's failure to disclose that Wright and Abdullah expected to be rewarded for their

testimony.  Not once does the PCRA court suggest that the ***Brady*** violation at issue stems from a lack of candor regarding the timing of Wright's coming forward.  Consequently, we reject this aspect of the Commonwealth's claim.

Regarding the second 'disputed' fact, the Commonwealth contends that there is no evidence in the record that Agent Wick promised Wright money in exchange for his testimony or that he expected payment for it. Certainly, the record does not *directly* support these claims, because Wright and Agent Wick denied these assertions.  However, the PCRA court rejected the Commonwealth's assertion that these facts lack support in the record:

> While Keith Wright was not in a position to pin-point *when* the discussion of money arose, he did say, and the Court believes him, that at one of the[] [legal] proceedings [at which Wright testified,] the topic of money came up.  The government wants to spin the facts that it was not until after the trial [that] … Wright and the topic of money intersected.  The [c]ourt finds to the contrary.  At some point between his grand jury appearance and the trial, the topic of money was discussed.  Otherwise, … Wright's comment about trust, "I just took it for what they said," rings hollow.  That sound is just not one this Court is willing to recognize.  Despite … Wright's obvious medical ailments that ha[ve] clearly hampered his ability to remember dates and [Agent] Wick's denials of ever talking about the reward, the court finds that … Wright did have discussions about money with [Agent] Wick.

PCO, at 19 (internal citations omitted).

Thus, based upon circumstantial evidence, the PCRA court concluded that Wright must have had discussions with Agent Wick about the reward. First, Wright indicated that such discussions occurred, but he could not recall specifically when they occurred.  Second, the PCRA court simply disbelieved

- 40 -

Agent Wick's account that the discussions did not occur before Appellee's trial. Third, the timing of Wright's coming forward in this case strongly suggests that he did so in response to the televised reward offer. Although Wright denied that he came forward because of the reward, he admitted that he came forward in response to a televised request, and other evidence in this case suggested that the televised request in question was accompanied by a reward offer.

Fourth, Wright's statements at the PCRA hearing strongly suggest that he discussed "money" with someone representing the Commonwealth, Agent Wick or otherwise, and did so during one of the several proceedings that occurred before Appellee's trial, although he could not identify at which proceeding that discussion had occurred. Wright was asked, "[I]nitially there was no talk about money, but at one of these proceedings you heard something about money. Is that right?" N.T., 2/15/12, at 60. Wright responded, "Yeah." *Id.* Wright had previously stated, regarding the proceedings being discussed in that exchange, "I guess it would had [*sic*] to been before the trial." *Id.* at 59. Fifth, there is no dispute that Wright was, in fact, paid a $10,000 reward following his testimony.

We reiterate that "we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record." *Ford*, 44 A.3d at 1194. Here, there are several pieces of circumstantial evidence supporting the PCRA court's finding that Agent Wick promised Wright, and Wright expected, a reward for his

testimony. Although some testimony contradicted this finding (specifically, the testimony of Agent Wick), that testimony was found not to be credible, and "[t]he PCRA court's credibility determinations are binding on this Court when they are supported by the record." **Commonwealth v. Paddy**, 15 A.3d 431, 442 (Pa. 2011). Consequently, this claim lacks merit.

Nevertheless, the Commonwealth contends that the PCRA court erred when it determined that the undisclosed impeachment information was material to an extent that it prejudiced Appellee. Specifically, the Commonwealth argues that the PCRA court erred when it determined that the jury "would have disregarded the substance of [Wright's and Abdullah's] testimony because of their motivations for testifying." Commonwealth's Brief at 63. The Commonwealth supports this assertion by alleging that "the reliability of Wright's and Abdullah's testimony was not determinative of Appellee's guilt. The PCRA court's analysis of the third prong of the **Brady** test ignored the fact that the Commonwealth's case did not hinge solely on the testimony of Wright and Abdullah." **Id.** at 63-64.

For Appellee to be eligible for relief under **Brady**,

> [t]he evidence alleged to have been withheld by the prosecution must have been material evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

> ***Brady*** does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses. Similarly, ***Brady*** does not require the prosecution to disclose every fruitless lead considered during the investigation of a crime. ***Brady*** sets forth a limited duty, not a general rule of discovery for criminal cases.

***Paddy***, 15 A.3d at 450-51 (internal citations and quotation marks omitted).

"[I]n order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." ***Commonwealth v. Johnson***, 727 A.2d 1089, 1094 (Pa. 1999). Nevertheless, "[t]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." ***Commonwealth v. Lambert***, 884 A.2d 848, 854 (Pa. 2005) (internal quotation marks omitted).

Here, the Commonwealth contends that the following evidence supported Appellee's conviction independent of the testimony of Wright and Abdullah:

> As the trial court recognized, the Commonwealth's evidence proved the fire was intentionally started by pouring gasoline on the basement floor. Buckner admitted she unloaded a gas container from her car on the night of the fire. Both Appellee and Buckner admitted during the interview process with Keystone representatives and with homicide detectives that they were in the basement at some point that evening. Motive existed to collect on a recently purchased insurance policy by

Buckner, and it was actually found after the fire sitting in front of the sofa in the family room.

Officer Workman, the first responder, briefly interviewed Mr. Buckner. According to Mr. Buckner, his wife and her son were out shopping and the rest of the family was able to get out of the house safely. About fifteen to twenty minutes later, Officer Workman repositioned his patrol car to the top of the block where Bricelyn and Foch Streets intersect in order to prevent non-emergency vehicle traffic from coming down the one-way street. A half hour to forty-five minutes after the officer first arrived, a car drove up to within two or three feet of the parked patrol car. Darlene Buckner exited the car and exclaimed "that's my house" before running down the street toward the fire scene.

Officer Workman noticed she was alone. So, he got out of his patrol car to check if there was a child inside her vehicle. There was no child, but he saw an infant car seat in the front passenger seat. Fifteen to twenty minutes later, after hearing a firefighter was injured, Officer Workman walked down to the burning house. As he approached the house, Officer Workman saw Appellee walking on the other side of Bricelyn Street coming up from the opposite direction. Appellee was talking with another civilian stating, "Hey, that's my crib, I can't believe it" or words to that effect.

Officer Workman's testimony refuted Appellee's testimony that he rode in the front seat with his mother to the store. It also refuted Buckner's deposition on April 15, 1995 to Keystone's attorneys that she removed her son's car seat from her car and put it inside the house before going to the store. Notably, McCord, another resident of Bricelyn Street, saw someone sitting in Buckner's car alone between 11:00 p.m. and 11:30 p.m.

Officer Workman's testimony also refuted Appellee's testimony that he and his mother drove up Exley Way, parked their car behind their house, and he ran through a neighbor's yard to talk with a firefighter. In contradiction to what Officer Workman observed, Appellee claimed he proceeded on foot in twenty seconds to join the rest of his family on Ms. Jean's porch while his mother moved their vehicle. In other words, Officer Workman's testimony undercut Appellee's testimony that after the arrival of emergency personnel, he got to the area in front of his residence before his mother.

Commonwealth's Brief at 65-67 (internal citations to the trial transcripts omitted).

Based on the above facts, the Commonwealth argues that "[i]t is clear that had the defense possessed the impeachment evidence regarding Wright and Abdullah[,] it would not have overcome the consistency and strength of the Commonwealth's evidence implicating Appellee." *Id.* at 67. We disagree. First, a substantial portion of the evidence cited by the Commonwealth pertains not to Appellee but to his mother, Darlene Buckner, who was ultimately acquitted of arson, murder, and conspiracy. Yet, the Commonwealth tries to paint all the evidence tending to demonstrate Buckner's culpability as evidence of Appellee's guilt. This Court cannot rationally accept that characterization of the evidence in light of Buckner's and Appellee's acquittals for conspiracy. For instance, the Commonwealth does not point to any evidence that Appellee knew of, much less shared, his mother's potential motive regarding the insurance policy. Similarly, evidence that Buckner had removed gasoline from her vehicle on the day of the fire may have circumstantially implicated her where the evidence suggested that the arson had been caused by gasoline, but that evidence, at best, only marginally and vaguely implicated Appellee's opportunity to have committed the crime. Moreover, the presence of a can of gasoline in a home is hardly a fact that suggests that any particular member of the household caused the fire. None of the evidence cited by the Commonwealth linked Appellee, specifically, as opposed to any other member of the household, to

the gasoline used to start the fire or the gasoline seen in the possession of his mother.

Second, while there is some rational connection between evidence pertaining to Buckner's and Appellee's culpability, the Commonwealth overstates its case. Officer Workman's testimony did appear to undermine Appellee's alibi by placing Ms. Buckner alone in her vehicle when she arrived at the scene of the fire. However, Officer Workman did not observe Ms. Buckner leave her residence and, thus, could not directly refute that Appellee had been with her when she went to the store. At best, Officer Workman's testimony cast doubt on the series of events that transpired when Buckner returned home, regarding if, how, when, and where Appellee exited Ms. Buckner's vehicle upon their return from the store. And although Officer Workman stated that Appellee was approaching the scene of the fire from a different direction 45-65 minutes after the first officers arrived at the scene, Wright's testimony placed Appellee near the conflagration much earlier, and under far more suspicious circumstances. PCO, at 17 (recognizing the trial court's finding that Wright's "[t]estimony … revealed that [Appellee] was seen standing across the street from his home at a time when smoke was seen pouring from a rear basement window and prior to the arrival of any emergency equipment") (quoting Trial Court Opinion, 9/15/98, at 2-4) (emphasis omitted). Indeed, as the PCRA court indicates, Agent Wick's PCRA hearing testimony unveiled the significance of Wright's testimony to the Commonwealth's case at trial, noting that "[d]espite

[Agent] Wick's efforts to downplay the significance of [the information provided by Wright], cross-examination revealed that, prior to the reward being announced to the public, the government had no evidence that put [Appellee] at the fire scene." PCO, at 18. Thus, it is clear that Wright's testimony was of critical importance in this case and, consequently, so was his credibility.

Third, the Commonwealth overlooks that the most damning evidence of Appellee's culpability came from Abdullah, who testified that Appellee had twice confessed to having started the fire. Given the circumstantial and sparse nature of the evidence incriminating Appellee, evidence of Appellee's confession/admission was by far the strongest evidence against him. Indeed, the complexion of the case against Appellee changes dramatically in the absence of this evidence. Without this evidence, the Commonwealth's case against him consists of his presence in the basement of his own home on the day of the fire (hardly a suspicious activity on its own), his mother's motive, and several holes in his alibi (the worst of which stemmed from Wright's testimony). Even if such evidence would be sufficient to convict Appellee, it is hardly a compelling or overwhelming case.

Thus, the Commonwealth's attack on the materiality of the impeachment evidence concerning Wright and Abdullah lacks merit. As noted above, the question for the PCRA court was not whether there was sufficient evidence absent the impeachable testimony, but whether "the favorable evidence could reasonably be taken to put the whole case in such

a different light as to undermine confidence in the verdict." **_Lambert_**, 884 A.2d at 854. Here, the PCRA court determined that, with regard to the impeachment evidence concerning Wright, "the non-disclosure of information, that most certainly would have negatively impacted his credibility, does not instill in this [c]ourt the necessary confidence that [Appellee] received a fair trial." PCO, at 23. Similarly, with regard to the impeachment evidence concerning Abdullah, the court stated, "[t]he defense's cross-examination of Abdullah and its closing argument are drastically different if armed with this information that was kept secret. So much different, that this [c]ourt does not have the confidence that the verdict would be the same if this information was presented to the jury." **_Id._** at 27. As such, at Appellee's trial, the reliability of Wright's and, particularly, the reliability of Abdullah's testimony, were "determinative of his guilt or innocence." **_Johnson_**, 727 A.2d at 1094.

Accordingly, Appellee was prejudiced by the absence of the withheld impeachment evidence. As such, we ascertain no error in the PCRA court's materiality determination(s). Consequently, we find no merit to the Commonwealth's assertion that the PCRA court erred in granting Appellee a new trial based on his **_Brady_**-based claims.

## Prosecutorial Misconduct

Finally, the Commonwealth asserts that the PCRA court erred when it granted Appellee a new trial based on his prosecutorial misconduct claim. Specifically, the Commonwealth argues that AUSA Sweeney did not "mislead

the jury about the existence of a reward fund, and he most certainly did not present false testimony from [Raoul] Gibson."[7]  Commonwealth's Brief at 76. Because we affirm the PCRA court's order granting a new trial based on Appellee's **Brady**-based claims, this claim is rendered moot.

Nevertheless, were we to reach this issue, we would find it meritless, because the Commonwealth misconstrues the nature of the PCRA court's ruling on Appellee's prosecutorial misconduct claim.  The PCRA court's prosecutorial misconduct ruling neither concerned Gibson's testimony nor AUSA Sweeney's cross-examination of Gibson.  Instead, the ruling addressed the fact that Wright and Abdullah both "denied the prospect of financial gain as influencing their testimony" during Appellee's trial.  PCO, at 28.  The PCRA court found that it was Agent Wick, not AUSA Sweeney or the Commonwealth's attorney, Marc Clark, Esq., who had committed prosecutorial misconduct by "not once … inform[ing] either prosecutor that Wright and Abdullah were not entirely accurate with their testimony."  **Id.** Thus, the Commonwealth's argument is meritless because it either misapprehends or otherwise misconstrues the substance of the prosecutorial misconduct ruling below.

Order **affirmed**.

---

[7] **See** footnote 1.

Judge Donohue joins this memorandum.

Judge Allen files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2015